# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
May 23, 2012 Session Heard at Cookeville[1]

## STATE OF TENNESSEE v. TRAVIS KINTE ECHOLS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 82476      Bobby R. McGee, Judge**

_____

**No. E2009-01697-SC-R11-CD - Filed October 10, 2012**

_____

The defendant, convicted of felony murder and sentenced to life in prison, appealed to the Court of Criminal Appeals alleging a number of errors in the conduct of the trial, particularly the trial court's failure to suppress a statement the defendant had made to the police. The Court of Criminal Appeals ruled that the statement was the product of an unlawful arrest, but held that the admission of the statement qualified as harmless error. This Court granted the defendant's application for permission to appeal in order to determine the propriety of the defendant's arrest and to consider whether the Court of Criminal Appeals had used the appropriate standard of review in its harmless error analysis. Because the arrest of the defendant was supported by probable cause and there was no other prejudicial error during the course of the trial, the judgment is affirmed.

### Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Affirmed

GARY R. WADE, C.J., delivered the opinion of the Court, in which JANICE M. HOLDER, CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Travis Kinte Echols.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Bledsoe and Mark A. Fulks, Senior Counsel; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

_____

[1] Oral argument was heard in this case on May 23, 2012, in Cookeville, Putnam County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

**OPINION**

On June 18, 2005, the Knoxville Police Department responded to a report of a shooting incident at parking lot C of the Townview Towers apartment complex in Knoxville.[2] The police found the victim, later identified as Robert Steely, a sixty-seven-year-old antique car dealer, slumped over in the driver's seat of a restored red and white 1958 Buick. The victim's wallet was missing, and he had bullet wounds in the chest. He later died at the University of Tennessee Hospital. The keys to the Buick were in the ignition, but the engine was off and the windows were down. Police discovered a loaded .38 Titan Tiger (".38 Special") revolver underneath the victim's left arm. The weapon contained five live rounds and one spent round. Two .22 caliber cartridge cases were located on the pavement near the Buick. Police found a .22 caliber bullet behind the passenger door panel of the Buick and a .38 caliber bullet, later determined to have been fired from the victim's gun, lodged in a vehicle nearby.

Investigator Steve Still of the Knoxville Police Department interviewed several individuals at the crime scene who had heard gunshots, but none had witnessed the shooting. The police also found the victim's fingerprints on the outside of the Buick, and those of Rebecca Ann Carpenter on the passenger side window frame and on a soft drink can. Testing of the three .22 caliber bullets, two of which were recovered from the victim's chest, produced inconclusive results. Although an expert was unable to determine whether they were fired from the same gun, the markings indicated that the bullets could have been fired from either a pistol, a semi-automatic revolver, or a rifle. Testing by the Tennessee Bureau of Investigation Crime Laboratory confirmed that the victim could have fired a weapon "or was near a gun when it fired."

Early in the investigation, Investigator Still received information from an unnamed source that Amanda Harshaw, a resident in unit D218 at the apartment complex, had permitted a black male named "Travis," who had a missing front tooth, to use her telephone shortly after the shooting took place. When questioned, Ms. Harshaw confirmed that she had overheard Travis say that he had shot someone in parking lot C who had a lot of money in his possession. Eight days after the shooting, Investigator Still received information from the same unnamed person that "Travis" had returned to Ms. Harshaw's apartment. Sergeant Tony Willis and several other officers were dispatched to the apartment. According to Sergeant Willis, a "female," presumably Ms. Harshaw, answered the door and gave him permission to search. Travis Kinte Echols ("the Defendant"), who matched the description Ms. Harshaw had given Investigator Still, was found in the bathroom of the apartment. Officers handcuffed the Defendant, who identified himself as Travis Brabson, and took him

---

[2] We refer to the apartment complex by its actual name, "Townview Towers," although portions of the record identify it as "Town View Towers."

into custody. Before the Defendant was questioned, Sergeant Willis learned that there was an outstanding warrant for a "Travis Brabson" for failure to appear in court.

Investigator Still advised the Defendant of his <u>Miranda</u> rights and conducted a videotaped interview. After acknowledging that he knew the victim had fired his weapon, Investigator Still informed the Defendant that his statement could make a difference between a possible life sentence and some other less onerous form of punishment. Eventually, the Defendant admitted shooting the victim, but asserted that he had acted in self-defense. He explained that after the shooting he had thrown the gun in a quarry located in Halls. He showed Investigator Still where he claimed to have disposed of the weapon, but it was never found.[3] Afterward, the Defendant was returned to the police station, the interview was concluded, he was charged, and placed in jail.

## Suppression Hearing

After being indicted for felony murder during the perpetration of a robbery, the Defendant moved to suppress the statement he had made to law enforcement officers, claiming that the statement was the product of an unlawful detention and arrest. The trial judge at that time, Kenneth F. Irvine, Jr., denied the motion. When Judge Irvine was succeeded in office by Judge Bobby R. McGee, the Defendant renewed the motion to suppress.

At the second suppression hearing, Investigator Still testified that during the week after the shooting, he discovered an individual who claimed to have learned that a man named "Travis" had admitted shooting somebody in lot C in a telephone call made from apartment D218 of Townview Towers. At that time, the police were not investigating any other shootings in lot C. Investigator Still interviewed Ms. Harshaw, the occupant of the apartment, and she confirmed that at some point after the shooting she had allowed a black male named "Travis," who was missing a front tooth, to use her telephone and that she had overheard him say he had shot someone in lot C. Ms. Harshaw assured Investigator Still that she would contact him if "Travis" showed up at her apartment again. On the night of June 26, 2005, the same individual who had referred Investigator Still to Ms. Harshaw called him while he was off duty to report that "Travis" was at apartment D218. Investigator Still then contacted Sergeant Tony Willis and asked him to go to Ms. Harshaw's apartment. A short while later, after the Defendant was taken into custody and transported to the jail, Investigator Still advised him of his rights and obtained a signed waiver before conducting an interview. When the Defendant indicated that he had a prior arrest in Anderson County, officials obtained his social security number and found several arrest records in the name of Travis Echols.

---

[3] Divers searched the quarry but were unable to recover the gun.

Sergeant Willis testified at the hearing that on June 26, 2005, he was on patrol duty when he received information from Investigator Still that the primary suspect in the lot C homicide was in apartment D218 at Townview Towers. Investigator Still described the suspect as an African-American male named "Travis" who was missing a front tooth. When Sergeant Willis and other officers arrived at the apartment, they were given permission by "a white female" to conduct a search. Sergeant Willis described her as "extremely nervous." Sergeant Willis found no one in the kitchen, living room, or the bedroom, but the bathroom door was closed. He directed the Defendant, who was inside, to come out. When the Defendant did so, he was ordered to the floor and handcuffed. The Defendant matched the description provided by Investigator Still and identified himself as Travis Brabson. While he was being taken to jail, which was only minutes away, Sergeant Willis learned that there was an outstanding arrest warrant for failure to appear on a misdemeanor drug citation in the name of Travis Brabson.

At the conclusion of the hearing, Judge McGee denied the motion to suppress, holding that the officer "had reasonable suspicion to justify a brief detention" and, for safety purposes, "to cuff him and take him into custody." While observing that the probable cause necessary to justify an arrest warrant was "pretty close," Judge McGee held that even if the police had insufficient information, the arrest was valid because the police soon learned of the warrant for the Defendant's arrest for his failure to appear in another case. Judge McGee also ruled that the Defendant's statement was not the product of coercion or intimidation.

**Trial**

At trial, the victim's daughter, Darlene Thomas, portrayed her father as an army veteran and a hard-working, family man who cared for his disabled wife for some twenty-one years prior to her death. She testified that the victim bought and restored antique cars as a hobby. She further testified that he always carried a wallet and that "[h]e might have seven or eight thousand dollars on him at one time." She stated that he typically had a handgun either in his pocket or under the front seat of his car, even though he did not have a permit. Ms. Thomas also stated that the victim had a girlfriend whom she had never met.

George Hammontree testified that on the date of the murder he had attended a birthday party at Townview Towers. He recalled that when he returned to his car for cigarettes, he dropped them to the floorboard and was reaching down to retrieve them when someone yelled, "Give it up[, g]ive it up." He then saw two black males and one white female next to a red and white car. He testified that one of the males, who had "dreadlocks," pointed a rifle at an older man who was seated in the vehicle with his hands in the air. When Hammontree saw the rifle, he moved to the floor of his van and then heard "pat, pat, pat, boom"—the sounds of "three small [shots] and then one big one." Hammontree, who claimed to be familiar with weapons, testified that the first three shots were fired from a .22

-4-

caliber automatic rifle whereas the final shot had come from a larger caliber gun. When he heard no more gunshots, Hammontree looked up and saw the female running with so much effort that she lost her tennis shoes. He recalled that the two males ran down a bank. Hammontree claimed that he was so scared by the shooting, he returned to the party and chose not to make a statement to police officers who later arrived at the scene.

One or two weeks later, Hammontree contacted Investigator Still and identified the Defendant from a photographic lineup as the individual who had shot the victim. At trial, Hammontree again identified the Defendant as the assailant, claiming "a hundred percent" certainty. On cross-examination, however, Hammontree acknowledged that during the Defendant's preliminary hearing, he had identified another individual as the person who fired the shots. He explained, however, that "[t]hey both look alike[,] . . . both had their hair poofed out" and that he had "just [made] a mistake" at the hearing as a result of his nervousness. Hammontree also admitted that he had a criminal record, including convictions for aggravated burglary, theft, and criminal impersonation. While acknowledging that forgery and theft charges were pending against him, he claimed that he was not promised anything by the State in return for his testimony against the Defendant.[4]

Rebecca Ann Carpenter, who sometimes worked as a prostitute and admitted to having a drug problem, testified that she had gone to Townview Towers to purchase drugs on the morning of the shooting. She stated that later that day, in a different part of town, she approached the victim because he had motioned for her to come to his car. She claimed that even though the victim had mistaken her for someone else, she spoke to the victim and then asked for a ride in his restored car. The victim agreed to drive her home and, according to Ms. Carpenter, offered to take her to his residence for drinks. She denied that they ever discussed sex. When she asked for "pot," the victim drove her to Townview Towers and removed eighteen dollars from his wallet, which, she said, contained "[l]ots of money." Upon arriving at the apartment complex, Ms. Carpenter walked down the steps into a corridor and recognized the Defendant as the person who had sold her crack cocaine earlier that morning. When Ms. Carpenter returned to the victim's car to ask for more money, she saw the Defendant point a silver and black, long-barrel weapon at the victim. Ms. Carpenter described the Defendant as a black male, with "long hair," "[k]ind of a fro like," and "[k]ind of frizzy looking," and possibly having a mustache. She claimed that she did not hear the Defendant say "give it up" and did not remember seeing the victim put his hands up in the air. She testified that when she heard the first gunshot she "hit the ground," and, when the firing ceased after four or five more shots, she reached in through the victim's open car

_____

[4] Later, when the charges against Hammontree were dismissed by the State, the trial court denied the Defendant's request to so inform the jury.

-5-

window, grabbed her purse from the passenger seat, and ran away. She claimed that the victim's wallet was still in his back pocket when she fled. She did not recall any other person besides the Defendant being near the scene of the shooting.

Ms. Carpenter further testified that as she fled down some steps after the shooting, she ran into the Defendant, who instructed her to go back and look for the shells from his gun. Ms. Carpenter stated that she ran out of her flip-flops as she returned to the scene and pretended to look for the shells, but became fearful and ran back down the steps. She claimed that the Defendant then told her to return to the vehicle and wipe away her fingerprints. Ms. Carpenter testified that she only pretended to follow the Defendant's instructions and did not wipe away her prints. Ms. Carpenter explained that she hid in the apartment complex for a period of time after the Defendant had left. Several weeks later, she told Investigator Still what had happened and identified the Defendant from a photographic lineup. When asked to make an identification of the Defendant during the trial, however, Ms. Carpenter testified that she was unable to because she could not "see good without [her] glasses." On cross-examination, Ms. Carpenter admitted to having a conviction for tampering with government records.

James Blackwell, who had been incarcerated with the Defendant at the Knox County penal farm, was serving a federal sentence for cocaine distribution at the time of the trial. Called as a witness by the State, he testified that the Defendant had informed him that he was facing twenty-five years to life for shooting and killing a man in self-defense. According to Blackwell, the Defendant confided that he was arranging for the man to buy drugs from his cousin, but when he saw how much money the man had, he armed himself with a .22 caliber rifle and then robbed him of almost ten thousand dollars. Blackwell recalled that the Defendant claimed that he shot the man only because the man had shot at him first. Blackwell stated that the Defendant referred to the money as "a knot," which he described as "[a] big wad of cash," and remembered that the Defendant had said he planned to use the money to pay for his attorney. He also recalled the Defendant saying that he tossed the gun into the river under the James White Parkway. On cross-examination, Blackwell admitted that he had entered into a plea agreement on his federal charge and that the plea agreement had set out the "nature, extent, and value of [his] cooperation" in this case. He conceded that the federal prosecutor had requested a downward departure from the federal sentencing guidelines as part of that plea agreement.

The Defendant, who testified in his own defense, first attempted to explain his use of two surnames. He claimed that at the age of fifteen his name was legally changed from Echols to Brabson. He explained that he did not change the name on his driver's license because he did not have the court order at the time he renewed his license. He further maintained that he signed "Echols" after his arrest only because he was charged under the

name Echols.

The Defendant testified that on the date of the shooting, he was selling drugs at Townview Towers when he saw a red and white car driven by the victim, who was white, and occupied by a white female enter into the parking lot. He explained "[n]ot too many white people just pull into [Townview Towers] unless they was looking for crack cocaine." The Defendant stated that when the female stepped out of the car, he first asked her for a cigarette, which he described as a customary "ice breaker" before a drug transaction, but she kept going and did not respond. He claimed that when he then asked the victim if he could have a cigarette, the victim "freaked out," reached under his seat for a gun, and, as the Defendant ran for cover, fired a shot. The Defendant admitted that he then took a gun from his back pocket and, fearing the victim might shoot again, fired three or four shots in his direction. He contended that he never ordered the victim to put his hands in the air. The Defendant denied that he robbed the victim and testified that after the shooting, he took his rental car, drove to a quarry in Halls, and threw the pistol into the water. He also contended that he never spoke to Blackwell, whom he had identified as a federal inmate by his beige uniform, because federal prisoners at the penal farm were known to cooperate with the police. He further denied that he had ever worn dreadlocks.

The jury returned a verdict of guilt for felony murder during the perpetration of a robbery, and the trial court imposed a sentence of life imprisonment. State v. Echols, No. E2009-01697-CCA-R3-CD, 2011 WL 2418737, at *1 (Tenn. Crim. App. June 14, 2011). On direct appeal, the Court of Criminal Appeals determined that the Defendant's statement should have been suppressed because (1) his arrest and detention prior to the statement were not supported by probable cause; and (2) that there was not a sufficient attenuation between the unlawful arrest and the statement. Id. at *13-14. The Court affirmed the conviction, however, because it determined that the erroneous admission of the statement had no effect on the verdict under the standard set out in Tennessee Rule of Appellate Procedure 36(b).[5] Id. at *14.

This Court granted the Defendant's Rule 11 application primarily to consider (1) whether the police had either reasonable suspicion to detain or probable cause to arrest the Defendant; and (2) whether the Court of Criminal Appeals should have evaluated the trial court's error in admitting the Defendant's statement under the non-structural constitutional standard, requiring a finding of harmless error beyond a reasonable doubt, rather than the

_____

[5] Tennessee Rule of Appellate Procedure 36(b) provides that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

-7-

standard for non-constitutional errors set out in Tennessee Rule of Appellate Procedure 36(b).[6] The Court has also chosen to address issues relating to the validity of the Defendant's waiver of his Miranda rights, the State's peremptory challenge of a prospective juror, the sufficiency of the evidence, and limitations on cross-examination. In our view, the Court of Criminal Appeals satisfactorily addressed and rejected the Defendant's claims as to the remaining issues: (1) the admission of evidence that the victim carried a wallet and large sums of cash; (2) the duty of the State to disclose exculpatory evidence; (3) the denial of a mistrial for comments made by the State during opening statement; and (4) the admission of re-enactment photographs. See Echols, 2011 WL 2418737, at *16-18, *21-22, *24-25.

## I.

The Defendant argues that the Court of Criminal Appeals correctly determined that the police officers did not have probable cause for the arrest and erred only by finding that the admission of his statement, although the product of an unlawful arrest, had no effect on the results of the trial. His argument is based, in part, on the fact that the individual who provided Investigator Still with the name of Ms. Harshaw was not identified during the course of the trial and, further, that Investigator Still did not offer specific proof as to whether Ms. Harshaw had a criminal history. The Defendant also describes Sergeant Willis' conduct as based upon "scant information," arguing that at the time he was arrested, he had not been linked to any specific shooting.

As an alternative ground for the suppression of his statement to Investigator Still, the Defendant argues that the waiver of his Miranda rights was not knowingly, intelligently, and voluntarily made. In support of this claim, the Defendant asserts that after his arrest, he was taken "in the middle of the night" to a small room at the police department and instructed by an armed officer to initial and sign the waiver of rights form even though the Defendant could neither read nor write well. The Defendant further complains that he was improperly influenced by Investigator Still's suggestion that telling his side of the story might be the difference between a short period of incarceration or one for life.

Initially, the standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Questions of credibility of the witnesses,

---

[6] As explained below, we have determined that there was probable cause for the warrantless arrest of the Defendant and that the Defendant knowingly, intelligently, and voluntarily waived his Miranda rights. Accordingly, the admission of his statement to Investigator Still was not erroneous, and we need not address whether the Court of Criminal Appeals should have evaluated the error under the harmlessness standard for non-structural constitutional errors.

the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. Id. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. Id.

Our review of a trial court's application of law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Further, when evaluating the correctness of the ruling by the trial court on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial. State v. Thacker, 164 S.W.3d 208, 248 (Tenn. 2005); State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998); see also 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.7(d), at 456-59 (4th ed. 2004) [hereinafter LaFave].

## A. Probable Cause

Both the state and federal constitutions protect against unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression. See U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). This Court has recognized three categories of police interventions with private citizens: (1) a full-scale arrest, which requires probable cause; (2) a brief investigatory detention, requiring reasonable suspicion of wrongdoing; and (3) a brief police-citizen encounter, requiring no objective justification. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000). "While arrests and investigatory stops are seizures implicating constitutional protections, consensual encounters are not." State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

A full-scale arrest supported by probable cause is, of course, an exception to the warrant requirement. State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citing Brown v. Illinois, 422 U.S. 590, 598 (1975)). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (second alteration in original) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)); see also State v. Richards, 286 S.W.3d 873, 879 (Tenn. 2009) ("[T]he 'prudent person' standard provides the best guidance for law enforcement officers and reviewing courts."). "Probable cause must be more than a mere suspicion." State v. Lawrence, 154 S.W.3d 71, 76 (Tenn. 2005) (citing State v. Melson, 638 S.W.2d 342, 350

(Tenn. 1982)). Nevertheless, probable cause "'deal[s] with probabilities[,] . . . not technical[ities,] . . . the factual and practical considerations of everyday life on which reasonable and prudent [persons] . . . act.'" State v. Day, 263 S.W.3d 891, 902 (Tenn. 2008) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)).

In addition, the existence of probable cause depends upon the accumulated information known to law enforcement. LaFave § 3.5(b), at 273-85. Information within the collective knowledge of law enforcement may properly factor into the probable cause inquiry, however, only if there exists a sufficient nexus of communication between the arresting officer and another officer with knowledge of the information in question. Such a nexus may be found when one officer relays information to another officer or when an officer directs or requests that another officer take action.[7] Id. § 3.5(a)-(b), at 269-74.

Further, Tennessee Code Annotated section 40-7-103(a) (2006) authorizes a felony arrest based upon "reasonable cause":

(a) An officer may, without a warrant, arrest a person:

. . . .

(3) When a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony[.]

In determining whether there exists a proper basis for arrest, our courts have not distinguished between the statutory term "reasonable cause" and the more traditional term "probable cause." See Melson, 638 S.W.2d at 350.

An arrest is defined as "'the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subject the person arrested to the actual control and will of the person making the arrest.'" State v. Crutcher, 989 S.W.2d 295, 301 (Tenn. 1999) (quoting West v. State, 425 S.W.2d 602, 605 (Tenn. 1968)); see also LaFave § 5.1(a), at 7-14. While an arrest may occur without formalities such as station house booking or an explicit declaration by an

---

[7] We also note that an arresting officer's reliance on information provided by another officer will not prevent the exclusion of evidence if the collective knowledge of law enforcement falls short of establishing probable cause. See Whiteley v. Warden, 401 U.S. 560, 568 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."), overruled in part by Arizona v. Evans, 514 U.S. 1, 13-14 (1995) (holding that evidence improperly seized based on incorrect information was not subject to suppression because the erroneous information resulted from clerical errors of court employees).

officer that a person is under arrest, "there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." Crutcher, 989 S.W.2d at 301-02. As with any seizure, "the litmus test is the objective belief of a reasonable person in the position of the defendant, not that of the officer." State v. Williams, 185 S.W.3d 311, 318 (Tenn. 2006).

Under the circumstances developed at trial, we begin with the proposition that the Defendant was placed under arrest at Ms. Harshaw's apartment. Multiple officers were present. The Defendant was ordered from the bathroom, required to lie on the floor, and then placed in handcuffs. As observed by the Court of Criminal Appeals, this qualified as a "full-blown arrest," not a brief investigatory detention as ruled by the trial court. Echols, 2011 WL 2418737, at *12. The significant question, therefore, is whether the police had the requisite probable cause to justify the arrest. Although the trial court may have accurately described the issue as "close," we believe that all of the information available to the police provided a proper basis for the arrest.

Initially, if an ordinary citizen provides information relied upon for probable cause, no showing of the informant's basis of knowledge or veracity is required. Melson, 638 S.W.2d at 354-56; State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993) (holding that a "citizen informant"—such as a victim or bystander witness—who provides information for a search warrant affidavit is entitled to a presumption of reliability). It is only when "the arresting officers rely in part on information from an informant from the criminal milieu[ that] they must be able to demonstrate that the informant (1) has a basis of knowledge and (2) is credible or his information is reliable." State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000); see also State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989) (adopting the two-prong test in Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969), for evaluating information in a search warrant affidavit provided to law enforcement by informants). In the absence of any information as to whether an anonymous informant is a citizen-informant, the reliability of the informant may not be presumed. See State v. Carter, 160 S.W.3d 526, 534 (Tenn. 2005).

In this instance, the record does not disclose information sufficient to determine whether the unidentified source who referred Investigator Still to Ms. Harshaw qualified as a citizen-informant. The fact that the unidentified source may not be presumed reliable, however, does not affect the probable cause determination under the facts of this case. Investigator Still used the information from the unidentified source only as a lead to investigate the shooting by interviewing Ms. Harshaw. Ms. Harshaw herself then provided Investigator Still with a description of the Defendant and described the phone conversation in which he admitted to shooting someone in parking lot C at Townview Towers. Moreover, the statement from Ms. Harshaw to Investigator Still substantiated the basis of the

unidentified informant's knowledge and accredited her claims.

As to Ms. Harshaw, we find there are sufficient facts to conclude that she was a citizen-informant. Investigator Still identified Ms. Harshaw at the suppression hearing, and he testified that when he checked her background, he found no criminal history. He further verified that he had spoken with her in person at her place of employment, at which time she verified that she lived in an apartment at the Townview Towers and provided the information regarding the phone conversation she overheard. These facts qualify Ms. Harshaw as a citizen-informant entitled to a presumption of reliability. See Melson, 638 S.W.2d at 354-56.

Furthermore, the information provided by Ms. Harshaw, combined with the other facts within the officers' collective knowledge, supplied probable cause to arrest the Defendant. The unidentified source informed Investigator Still a few days after the shooting that Ms. Harshaw had overheard the Defendant admit to shooting someone in lot C at the Townview Towers. Investigator Still, acting on the tip, interviewed Ms. Harshaw, who confirmed that she had overheard "Travis"—whom she described as a black male with a missing front tooth—admit to shooting someone in the parking lot of the apartment complex. Within a few days, the same unnamed source telephoned Investigator Still to report that "Travis" was at Ms. Harshaw's apartment. Investigator Still, who was off duty at the time he received the call, informed Sergeant Willis that the primary suspect in the shooting was at apartment D218 in the Townview Towers. Investigator Still provided Sergeant Willis with the description of the suspect and asked him to "locate [Travis] and detain him." When he arrived at the apartment, Sergeant Willis asked for and received permission from Ms. Harshaw to conduct a search. When Sergeant Willis discovered that someone was in the bathroom, he directed that person to come out. At that point, the Defendant, a black male with a missing or broken front tooth, emerged from the bathroom, and, during the course of the arrest, identified himself as "Travis Brabson." At all times from the death of the victim until the Defendant's arrest, no other homicides at lot C were under investigation. Further, there had been no other shootings at lot C during the week after the crime.

From all of this, we conclude that based upon the evidence submitted at the suppression hearing and the trial, the collective knowledge of Investigator Still and Sergeant Willis qualified as "'reasonably trustworthy information'" from which a prudent person could infer that the Defendant had committed an offense. Day, 263 S.W.3d at 902 (quoting Brinegar, 338 U.S. at 175-76). The police, therefore, had a proper basis for the arrest.

### B. Waiver of Miranda Rights

The Defendant also argues that he did not voluntarily waive his Miranda rights. It is the duty of the trial judge to determine the voluntariness and the admissibility of a defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). In

Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court ruled that before a custodial interrogation, police officers must advise a defendant of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in the prosecution's case-in-chief at trial. Dickerson v. United States, 530 U.S. 428, 443-44 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 479; State v. Mann, 959 S.W.2d 503, 529 (Tenn. 1997). In determining whether a waiver of Miranda rights was voluntary, knowing, and intelligent, the totality of the circumstances must be examined. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998); State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). Certain factors apply in the determination of whether a waiver of Miranda rights qualifies as voluntary, knowing, and intelligent: the age and background of the defendant; his education and intelligence level; his reading and writing skills; his demeanor and responsiveness to questions; his prior experience with the police; any mental disease or disorder; any intoxication at the time of the waiver; and the manner, detail, and language in which the Miranda rights were explained. See State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000); Callahan, 979 S.W.2d at 583 (discussing waiver of Miranda rights by juvenile).

The record establishes that Investigator Still read to the Defendant all of the rights outlined in Miranda. When the Defendant hesitated before signing the form, Investigator Still informed him that he could stop the interview at any time. The Defendant then signed the form, as requested. The Defendant was twenty-six years of age at the time of the interview, was a high school graduate, and had experienced previous encounters with law enforcement. The length of his detention prior to the interview was relatively brief. The Defendant was neither intoxicated nor ill at the time of his statement. Nothing indicated that he suffered from any mental disorder. Further, there was no suggestion of police abuse or threats. In our view, the trial court and the Court of Criminal Appeals properly found that the Defendant had knowingly, intelligently, and voluntarily waived his rights under Miranda.

## II.

The Defendant next argues that the State, by peremptory challenge, improperly removed one of only two African Americans on the prospective juror list. In response, the State submits that the challenge was not discriminatory. During voir dire, the State utilized a peremptory challenge to excuse an African-American woman as a prospective juror. The Defendant challenged the State's use of the peremptory challenge, pointing out that she was one of only two African Americans on the panel. While acknowledging that no specific questions had been asked of the prospective juror, the State explained that she had failed to make eye contact when examined, had "asked the court officer something," and was "rocking back . . . in her chair and fidgeting," and, therefore, the State had "sense[d] that she [did not]

want to be [there] . . . to the level of almost being angry about still being seated." The Defendant pointed out that there were other potential jurors who had vocalized a desire to be excused from jury service and were denied, whereas the prospective juror at issue had not made any objections.

In Batson v. Kentucky, 476 U.S. 79, 89 (1986), the United States Supreme Court held that the prosecutor's use of peremptory challenges to intentionally exclude jurors of the defendant's race violates his right to equal protection under the Fourteenth Amendment to the United States Constitution. Five years later, in Powers v. Ohio, 499 U.S. 400, 409 (1991), the Court eliminated the requirement that any wrongfully excluded juror be of the same race as the defendant in order to merit protection under the rule. See also State v. Ellison, 841 S.W.2d 824, 826 (Tenn. 1992). Under Powers, a defendant establishes a prima facie case of purposeful discrimination merely by demonstrating that the prosecution excluded members of a cognizable racial group from the jury pool. Ellison, 841 S.W.2d at 826 (citing Powers, 499 U.S. at 416). If a defendant establishes a prima facie case of impermissible discrimination, the State must provide a race-neutral explanation for the challenges at issue. State v. Kiser, 284 S.W.3d 227, 255-56 (Tenn. 2009). If the State offers a race-neutral explanation, the trial court must "determine, 'from all of the circumstances, whether the defendant has established purposeful discrimination.'"[8] Id. (quoting State v. Hugueley, 185 S.W.3d 356, 368 (Tenn. 2006)). "The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." Id. (quoting Hugueley, 185 S.W.3d at 368). We have emphasized that under the Batson rule, trial courts "must carefully articulate specific reasons for each finding on the record, i.e., whether a prima facie case has been established; whether a neutral explanation has been given; and whether the totality of the circumstances support a finding of purposeful discrimination." Hugueley, 185 S.W.3d at 369 (quoting Woodson v. Porter Brown Limestone Co., 916 S.W.2d 896, 906 (Tenn. 1996)).

In this instance, the trial court did not expressly find that the Defendant had made a

---

[8] Analogizing to case law applying Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000e et seq. (1982), the Court in Batson suggested that decisions involving disparate treatment claims in the employment context "have explained the operation of prima facie burden of proof rules." 476 U.S. at 94 n.18. In Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531, 540 (9th Cir. 1982), the court held that whether the "proof established a prima facie case thus shifting the burden . . . is a legal conclusion freely reviewable on appeal." When the trial court's findings are based on the credibility of witnesses, however, the standard of review is whether the decision was clearly erroneous. See Sherpell v. Humnoke Sch. Dist. No. 5 of Lonoke Cnty., 874 F.2d 536, 539 (8th Cir. 1989); Barnes v. Small, 840 F.2d 972, 976 (D.C. Cir. 1988). This standard of review extends to the trial court's evaluation of a prosecutor's credibility in ruling on a Batson claim. Kiser, 284 S.W.3d at 255-56.

prima facie case of purposeful discrimination but considered the State's explanation and upheld the challenge to the prospective juror as race neutral. The trial judge stated, "I've noticed also some of the things [the State] is talking about. [The prospective juror] has gotten the officer's attention a couple of times." In making the ruling, the trial judge explained that the prospective juror appeared to be anxious and that "she had, in fact, asked permission to leave the courtroom." In our view, the totality of the circumstances does not support a finding of purposeful discrimination. The trial court properly overruled the Defendant's objection to the peremptory challenge.

### III.

The Defendant also argues that the evidence was insufficient to establish that the Defendant killed the victim during the perpetration of a robbery. He submits that there exists reasonable doubt as to whether the shooting was in self-defense rather than during the perpetration of a robbery.

Traditional principles apply to the appellate review of challenges to the sufficiency of the convicting evidence. Initially, a guilty verdict "shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). Further, "the State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007) (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). The jury, as the trier of fact, is empowered to assess the credibility of the witnesses, to address the weight to be given their testimony, and to reconcile any conflicts in the proof. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). The relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)).

The State presented direct evidence of the Defendant's guilt and also offered circumstantial evidence. A criminal offense may, of course, be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973). Ultimately, however, the jury must decide the significance of the circumstantial evidence, as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). We may

not substitute our own inferences for those drawn by the trier of fact. State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010). In State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011), this Court abolished any distinction between the standard of proof required at trial in cases based solely upon circumstantial evidence and that in cases where direct evidence of guilt is presented by the State. The standard of review is, therefore, identical whether the conviction is based upon direct evidence or circumstantial evidence or a combination of both, as in the case before us. Id. at 379; see also Hanson, 279 S.W.3d at 275.

Felony murder is defined, in relevant part, as the "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (2010). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear."[9] Id. § 39-13-401(a). The State is, of course, required to prove each and every element of the offense during the course of the trial.

Self-defense is a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). At the time of the shooting, self-defense was defined by statute, which, in pertinent part, provided as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.
>
> . . . .
>
> (d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force . . . .

Tenn. Code Ann. § 39-11-611 (2006).

By the terms of this statute, the jury was called upon to determine whether the

---

[9] "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103(a).

Defendant had a reasonable belief that he was in "imminent danger of death or serious bodily injury" and whether he "provoked the . . . use or attempted use of unlawful force" against him. Id. At the conclusion of the proof, the jury, which has the duty to consider the testimony, address the credibility of the witnesses, and reconcile any conflicts in the evidence offered, rejected the Defendant's claim of self-defense, concluding instead that he had caused the death of the victim in the perpetration of a robbery.

In this appeal, we must afford the State the strongest legitimate interpretation of the evidence. Vasques, 221 S.W.3d at 521. George Hammontree testified that he saw the Defendant pointing a rifle at the victim, who held his hands in the air. Although Hammontree did not see the actual shooting, he was familiar with weaponry and identified the first three shots he heard as fired from a .22 caliber automatic weapon. He described the final shot as having been fired from a weapon with a higher caliber. Other proof established that a single shot was fired from the victim's .38 caliber revolver. Hammontree identified the Defendant as the perpetrator, first from a photographic array and later at trial.

Rebecca Ann Carpenter heard a gunshot, saw the Defendant holding a long gun, and ran from the scene. She testified that the victim had a wallet when she left his car. The police conducting the investigation at the scene did not find a wallet in the victim's possession. Ms. Carpenter identified the Defendant from a photographic array.

James Blackwell, who was in jail with the Defendant before the trial in this case, testified that the Defendant admitted pointing a .22 caliber rifle at the victim, demanding his money, and shooting the victim. Blackwell recalled that the Defendant also claimed to have taken almost $10,000 from the victim's pocket. Consistent with the statement he made to Investigator Still, the Defendant told Blackwell that he fired only after the victim shot first.

In his statement to Investigator Still, the Defendant admitted shooting at the victim three or four times with a .22 caliber weapon. As indicated previously, however, he claimed that the victim had fired first and that he was acting in self-defense.

Viewed in the light most favorable to the State, the proof established that the Defendant shot and killed the victim during the course of a robbery, which satisfies the elements necessary to support a conviction for felony murder. Because a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the evidence in the record is sufficient to support the verdict of the jury.

## IV.

The Defendant asserts that the trial court committed error by limiting his cross-examination of three witnesses for the State: George Hammontree, Darlene Thomas, and

Investigator Still.

Cross-examination is a fundamental right afforded by the Confrontation Clause of the Sixth Amendment. U.S. Const. amend VI; Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); see also Tenn. Const. art. I, § 9. A component part of this constitutional protection is the right to establish bias or to otherwise impeach the credibility of a witness. Rice, 184 S.W.3d at 670; State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001); State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993). The propriety, scope, manner, and control of cross-examination of witnesses, however, remain within the discretion of the trial court. State v. Reid, 213 S.W.3d 792, 839 (Tenn. 2006); Rice, 184 S.W.3d at 670. The trial court abuses its discretion by unreasonably restricting a defendant's right to cross-examine a witness against him. Reid, 213 S.W.3d at 839; Rice, 184 S.W.3d at 670; Davis v. State, 212 S.W.2d 374, 375 (Tenn. 1948).

When a defendant is denied the right to conduct an effective cross-examination, the conviction will stand only if the violation is deemed harmless beyond a reasonable doubt. Rice, 184 S.W.3d at 670; Sayles, 49 S.W.3d at 280; see also State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008) (discussing the harmlessness standard for constitutional errors). Whether an error is harmless depends upon various factors, including "'the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" Rice, 184 S.W.3d at 670-71 (quoting Van Arsdall, 475 U.S. at 684).

With these principles in mind, we turn to the specific complaints made by the Defendant regarding limitations on his cross-examination of the State witnesses.

### A.  George Hammontree

The Defendant argues that the trial court unreasonably restricted his cross-examination of George Hammontree by denying his request to inform the jury that the State dismissed forgery and theft charges against Hammontree two days after he testified at the trial of this case. When the State dismissed the charges against Hammontree, the Defendant asked permission to inform the jury of the dismissal either through judicial notice or by calling a court official to testify.[10] The State acknowledged that the charges against Hammontree had been dismissed, but asserted that the dismissal was not in exchange for his testimony in this case. The trial court refused to allow the Defendant to offer proof that the charges had been dismissed. The Court of Criminal Appeals held that the trial court did not

---

[10] The charges against Hammontree were in the same court as the instant case.

err, noting that the State and Hammontree specifically denied the existence of any agreement to dismiss the charges in exchange for the testimony.

Initially, proof suggesting that a witness received or had reason to expect leniency from the State typically constitutes relevant evidence of bias. See State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); Neil P. Cohen et al., Tennessee Law of Evidence § 6.16[2][a], at 6-174 to -175 (5th ed. 2005); see also United States v. Abel, 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness's testimony."). Moreover, this Court has previously set out the parameters of the right to impeach a witness based upon lenient treatment from the State regarding criminal charges. For example, in Sayles, one of the witnesses for the State, who was in custody on a charge of aggravated robbery, initially refused to testify, contending that the defendant had made threats against him and his family. 49 S.W.3d at 277-78 & n.2. Following a discussion outside of the presence of the jury, the State called the witness, who provided key, incriminating testimony against the defendant. Id. at 277-78. After the witness was excused, the trial court granted a request by the State to reduce the bond for a pending charge against the witness. Id. at 278 & n.3. In addition, the State announced its intent to reduce the charge against the witness, which it later did. Id. at 278 & n.4. The trial court denied a request by the defendant to inform the jury of the bond reduction or to make an offer of proof as to whether the State provided favorable treatment to the witness in exchange for his testimony. Id. at 278. This Court ruled that the trial court had erred, holding that the defendant "should have been allowed to examine witnesses to determine whether there was a connection between the largesse extended to [the witness] and his testimony." Id. at 279.

Similarly, in Smith, a State witness received a favorable plea bargain on a pending felony charge soon after coming forth with pertinent information. 893 S.W.2d at 923. The trial court did not allow the defendant to cross-examine the witness about possible bias. Id. This Court ruled that the trial court should not have restricted the defendant from addressing the issue on cross-examination. Id. at 924.

The same reasoning applies here. Two days after Hammontree provided incriminating evidence in this case, the State dismissed the forgery and theft charges against him. The dismissal of the charges was relevant evidence of bias, particularly in light of its timing. The fact that the State and Hammontree denied the existence of a connection between his testimony and the dismissal of the charges did not justify the exclusion of contrary evidence for the jury to weigh in evaluating the credibility of that testimony. See Sayles, 49 S.W.3d at 279-80 (finding that evidence that the State recommended a bond reduction out of concern for the safety of the witness rather than in exchange for his testimony did not justify the exclusion of contrary proof). The trial court erred by failing to afford the Defendant the

opportunity to impeach Hammontree by introducing evidence of bias.[11]

In our view, however, this error qualifies as harmless beyond a reasonable doubt. In his recorded statement to Investigator Still, the Defendant acknowledged that he shot the victim. He informed Blackwell that he had shot and robbed the victim. Although the testimony provided by Hammontree was important to the State, he was not the only eye witness. Ms. Carpenter also testified that she saw the Defendant pointing a long-barrel gun at the victim, which contradicted the Defendant's testimony that he fired a pistol at the victim in self-defense. Moreover, despite the improper exclusion of the dismissal of the charges against Hammontree, the trial court did not otherwise unduly restrict the Defendant from impeaching his credibility. For example, the trial court permitted the Defendant to question Hammontree about his various prior convictions as well as the pending forgery and theft charges, including whether the State had promised him favorable treatment as to those charges in exchange for his testimony. Furthermore, because the Defendant did not offer any other evidence of a possible connection between the dismissal of the charges against Hammontree and his testimony, the evidence excluded as a result of the error was limited to the fact of the dismissal. Cf. Sayles, 49 S.W.3d at 279-80 (noting that error deprived the defendant of the opportunity to examine witnesses regarding a possible connection between the leniency afforded the witness and his testimony). In our view, the improper exclusion of evidence of the dismissal qualified, under these circumstances, as harmless beyond a reasonable doubt. See Rodriguez, 254 S.W.3d at 371; Rice, 184 S.W.3d at 670-71.

### B.  Darlene Thomas

The Defendant next contends that the trial court unreasonably restricted the cross-examination of Darlene Thomas regarding her contact with Bennie Pruitt, who was Hammontree's aunt and the purported victim in the forgery and theft charges against him. During the cross-examination of Ms. Thomas, the Defendant attempted to ask her about any efforts she had made to get Pruitt to withdraw the charges in exchange for Hammontree's

---

[11] The fact that the Defendant sought to show the dismissal of the charges through extrinsic evidence rather than further examination of Hammontree does not alter our conclusion. Tennessee Rule of Evidence 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." In addition, we have previously acknowledged that the right to impeach the credibility of a witness encompasses the examination of witnesses other than the witness whose credibility is at issue. See, e.g., Sayles, 49 S.W.3d at 279 (noting that the defendant should have been permitted to "examine witnesses" to introduce evidence that the witness for the State was biased); Howell, 868 S.W.2d at 252 (holding that the trial court erred by refusing to allow the defendant to impeach the former recorded testimony of his co-defendant with evidence that the co-defendant later recanted that testimony); see also State v. Reid, 882 S.W.2d 423, 428-29 (Tenn. Crim. App. 1994) (holding that the trial court erred by not allowing the defendant to impeach a witness through cross-examination and extrinsic evidence).

testimony in this case. The State objected to this line of questioning, and the trial court sustained the State's objection in part, allowing the Defendant to ask Ms. Thomas about her relationship with Hammontree but holding that any further questioning on the issue would have to be directed toward Hammontree. In response to the cross-examination, Ms. Thomas contended that she did not have a relationship with Hammontree but acknowledged that she had contacted Pruitt upon finding out that she was Hammontree's aunt. The Defendant did not address the issue during his subsequent examination of Hammontree. The Court of Criminal Appeals found that the trial court had not erred, noting in particular the Defendant's failure to follow up on this issue during Hammontree's testimony.

We also hold that the trial court's restriction on the cross-examination did not amount to an abuse of discretion. Because the defense primarily sought to establish that Hammontree, rather than Ms. Thomas, provided incriminating testimony against the Defendant as part of some arrangement to secure the dismissal of his own criminal charges, the trial court did not act unreasonably by directing that the matter be addressed during Hammontree's testimony. Under these circumstances, there was no error.

### C. Investigator Still

The Defendant further argues that the trial court committed error by allowing the State to play a redacted recording of his interview with Investigator Still without permitting questions about the redacted portions of the recording.

During the interview, the Defendant admitted shooting the victim, but maintained that he did so in self-defense. During a redacted portion of the recording, Investigator Still told the Defendant that

> there is one spectrum where you could spend the rest of your life in jail . . . and then you've got stuff on the other end, and it just depends on what you tell me. But it's a big difference between cutting a little bit of time and spending the rest of your life in jail.

In another redacted portion, Investigator Still said to the Defendant,

> This is your life, and this is a life decision that you've got to make . . . . [I]f you don't need to spend the rest of your life in jail, I don't want to be part of that, but you've got to be straight up with me, and you've got to be truthful . . . . I know the guy shot at you.

The trial court allowed the State to redact these portions of the recording pursuant to Tennessee Code Annotated section 40-35-201(b) (2010), which provides that in non-capital

criminal cases, "the judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged." While the Defendant had been provided with an unedited copy of the recording, the trial court denied his request to review the redacted version of the recording before it was played for the jury. The trial court also refused to allow the Defendant to cross-examine Investigator Still about the redactions, explaining that the confession was voluntary and "[w]e're not going into punishments." On redirect examination, however, Investigator Still acknowledged that he used the technique of "minimilization," which he described as "making light" of the incident in question, as well as the technique of telling the suspect that he had information about the shooting that in reality he did not have. To illustrate, Investigator Still admitted telling the Defendant during the interrogation that he knew the victim had shot at the Defendant first.

The Court of Criminal Appeals held that Tennessee Code Annotated section 40-35-201(b) did not provide a basis for redacting the recording and that the trial court erred by not allowing the Defendant to explore the redacted portions of the recording during his cross-examination of Investigator Still. Nevertheless, the Court of Criminal Appeals found the error to be harmless, primarily based on Investigator Still's testimony. Echols, 2011 WL 2418737, at *21.

We agree with the Court of Criminal Appeals. In our view, the trial court did abuse its discretion by restricting the cross-examination of Investigator Still as to the redacted portions of the interview. Tennessee Code Annotated section 40-35-201(b) merely prohibits trial judges, the State, and the defense from commenting to the jury "on possible penalties for the offense charged." Nothing in the text of section 40-35-201(b) prohibits the introduction of a recorded statement by a witness, made prior to any charge, that a suspect could face "life in jail" as opposed to "a little bit of time" depending on what he tells the interrogating officer. The Court of Criminal Appeals properly ruled, therefore, that section 40-35-201(b) neither mandated nor justified limitations on cross-examination.[12]

Nor did the trial court's prior ruling on the voluntariness and admissibility of the statement justify restricting the cross-examination. While the trial court's role is to decide the voluntariness of a defendant's statement in determining its admissibility as evidence at trial, see Mann, 959 S.W.2d at 528, that does not alter the function of the jury to consider the truthfulness of a statement made to the police. Pursley, 550 S.W.2d at 950. "To aid them in resolving these questions the jury may hear evidence of the circumstances under which the confession was procured." Id. (quoting Wynn v. State, 181 S.W.2d 332, 333 (Tenn. 1944)); see also Crane v. Kentucky, 476 U.S. 683, 690-91 (1986) (holding that exclusion of evidence

---

[12] The trial court also should have allowed the Defendant to review the redacted version of the recording prior to it being played for the jury.

showing the circumstances of a defendant's confession violated his constitutional right to present a complete defense). By limiting the cross-examination of Investigator Still in this manner, the trial court committed error.

As noted by the Court of Criminal Appeals, however, Investigator Still's testimony on redirect examination made the jury aware that he had employed interrogation techniques designed to elicit an incriminating statement. More importantly, the statements made by the Defendant during his interrogation were entirely consistent with the theory of self-defense he argued at trial. Cf. Crane, 476 U.S. at 691 (reasoning that, because the accused's defense was that he did not commit the offense charged and falsely confessed, "introducing evidence of the physical circumstances that yielded the confession was all but indispensable to any chance of [his defense] succeeding"). Under these circumstances, the unwarranted restriction on the cross-examination of Investigator Still qualified as harmless beyond a reasonable doubt, having no effect on the outcome of the trial. See Rodriguez, 254 S.W.3d at 371.

**Conclusion**

Because the collective information of the police established probable cause for the warrantless arrest of the Defendant, his statement acknowledging that he had shot the victim and disposed of the weapon was properly admitted at trial. Although the trial court erroneously limited the cross-examination of two State witnesses, the errors qualified as harmless beyond a reasonable doubt as other evidence mitigated the effect of these errors. The judgment is, therefore, affirmed. It appearing that the Defendant is indigent, costs are taxed to the State of Tennessee.

_____
GARY R. WADE, CHIEF JUSTICE