IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 25, 2013 Session

## STATE OF TENNESSEE v. CHERYL REBECCA NORWOOD

**Appeal from the Criminal Court for Monroe County**
**No. 11-325 Carroll L. Ross, Presiding Judge**

_____

**No. E2012-02218-CCA-R9-CD - Filed November 15, 2013**

_____

The defendant (along with several co-defendants) was indicted on eight counts of a ten-count indictment: one count of first degree murder; one count of conspiracy to commit first degree murder; one count of arson; two counts of tampering with evidence; one count of theft of property valued at $10,000 or more; one count of abuse of a corpse; and one count of credit card fraud. Prior to trial, the trial court granted the defendant's motion to suppress three statements given to police after the defendant was "voluntarily" detained. The State sought and received permission to file an interlocutory appeal. Upon review, we conclude that the defendant was, in fact, arrested when she was detained but that her arrest was supported by probable cause. We further conclude that the defendant was given sufficiently prompt judicial review of the officer's probable cause determination. For these reasons, the trial court's order granting the defendant's motion to suppress is reversed, and the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Criminal Court is Reversed and Remanded.**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, and ROGER A. PAGE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellant, State of Tennessee.

W. Tyler Weiss, Madisonville, Tennessee (on appeal); and Randy George Rogers and Matthew Rogers, Athens, Tennessee (at trial); for the appellee, Cheryl Rebecca Norwood.

## OPINION

## FACTS AND PROCEDURAL HISTORY

On September 7, 2011, the defendant, Cheryl Rebecca Norwood, and three co-defendants were indicted by a Monroe County grand jury on ten counts stemming from their alleged involvement in the murder of the victim, her romantic partner, Tony Presley. The defendant was specifically charged with one count of conspiracy to commit murder in violation of Tennessee Code Annotated section 39-12-103, a Class A felony; one count of first degree (premeditated) murder in violation of Tennessee Code Annotated section 39-13-202; one count of abuse of a corpse in violation of Tennessee Code Annotated section 39-17-312(a), a Class E felony, two count of tampering with evidence in violation of Tennessee Code Annotated section 39-16-503; Class C felonies; one count of arson in violation of Tennessee Code Annotated section 39-14-301(a)(1), a Class C felony; one count of theft of property valued at $10,000 or more in violation of Tennessee Code Annotated section 39-14-103, a Class C felony; and one count of fraudulent use of a credit card in violation of Tennessee Code Annotated section 39-14-118(a), a Class A misdemeanor. Prior to her trial, the defendant filed a motion to suppress three videotaped statements she gave to the police. In the first interview, which lasted one hour and twenty-six minutes and was conducted on April 13, 2011, the defendant claimed that the victim had left at 3:00 a.m. on April 8, 2011, in the company of two Hispanic men named Pepe and Don Juan, and that she had no idea of his present whereabouts. In the second interview, which lasted an hour and forty-five minutes and was conducted on April 14, 2011, the defendant acknowledged arguing with the victim and being present in the home when he was killed but placed the blame for the killing on her co-defendants, Mr. Nicolas Ronnie Dean Jones and Mr. John Tyler, the former of which she claimed shot the victim and the latter of which she claimed tried to kill the wounded victim by striking him in the head with a skillet. In the final interview, which lasted an hour and twenty-two minutes and occurred on April 15, 2011, the defendant admitted to stabbing the victim in the neck with a kitchen knife after he was shot.

At a pretrial hearing held on July 5, 2012, the trial court heard evidence concerning the defendant's motion to suppress. Detective Brannon testified that he interviewed the defendant during the course of an investigation into the victim's disappearance. He testified that he initially became interested in speaking with the defendant because, as the victim's reputed live-in girlfriend, he believed that the defendant might have been the last person to see the victim before his disappearance. His desire to speak with the defendant only increased when the victim's house was discovered burned to the ground. He testified that during the course of his investigation, he became aware that some property left in the victim's care—specifically, a white Ford Mustang registered to a Mr. Jim Bivins—was missing. He testified that the Ford Mustang "was entered into the National Crime Information Center, NCIC, listed as a stolen vehicle." Detective Brannon testified that he

was aware that officers in Georgia subsequently "made contact with that vehicle," but that he was unaware of the specifics of that contact. Detective Brannon testified that the defendant eventually gave three different statements to police, and he was present for the last two of those statements.

On cross-examination, Detective Brannon testified that he was involved in the investigation of a house fire that occurred on Sunday, April 10, 2011. In conjunction with that investigation, members of his department requested a search warrant of an address on Cane Creek Mountain Road on April 13, 2011. After receiving the warrant, members of the Tennessee Bomb and Arson Division and a cadaver-sniffing dog arrived at that address.

Officer Kevin Heaton, formerly of the Commerce City Police Department in Georgia, testified that at 12:58 a.m. on the morning of April 12, 2011, he stopped a vehicle that was being driven by the defendant because it had run a stop sign. He testified that Ms. Tammy Carter and Mr. Gregory Carter were passengers in the vehicle. He testified that during the course of the stop, he noticed that the vehicle bore two different license plates—a permanent plate and a temporary plate that was visible through the back window. He testified that he ran both license plates through the system, and neither one came back as "on file." When he checked the vehicle's VIN number, he discovered that the vehicle had been reported stolen. He testified that when he asked the dispatcher to confirm the report, the dispatcher began "kind of going back and forth with Monroe County investigators, and . . . I just told them to give them my number and I would talk to them directly."

Officer Heaton testified that he spoke with Detective Travis Jones of the Monroe County Sheriff's Department. He testified that Detective Jones informed him that the defendant was a suspect in a homicide investigation. He testified that he was informed that no warrant for the defendant's arrest had been issued. Officer Heaton testified that Detective Jones asked him to positively identify the defendant by taking a picture of her and sending the picture to his cell phone. Officer Heaton testified that he complied with this request. He testified that afterward, Detective Jones asked him if he would get the defendant's consent to go to the police department and wait for Monroe County police officers to drive down from Tennessee to interview her. Officer Heaton testified that he asked for the defendant's consent, and after receiving it, he placed all three of the Mustang's occupants in the back of his cruiser and transported them back to the police station. He also testified that he called a tow truck to tow the Mustang to the police station's parking lot—an area that also served as the police impound lot.

Officer Heaton testified that when they arrived back at the police station, he had the defendant placed in a holding cell. He testified that he was familiar with the station's holding cell because he had "slept in it before." While on the stand, Officer Heaton was

shown pictures of one of the station's holding cells, which he authenticated, and which were entered into evidence. He testified that the defendant was kept in the holding cell until Detective Jones arrived approximately three hours later, and it was his belief that the defendant eventually left in the company of the Monroe County Sheriff's Department. Officer Heaton acknowledged the existence of a property receipt for a Ford Mustang indicating that the vehicle arrived around 1:00 a.m. on April 12, 2011, and was retrieved on May 17, 2011, by Mr. Bivins. Officer Heaton testified that he ticketed the defendant for running the stop sign, but he did not charge the defendant for driving a stolen vehicle. Officer Heaton testified that driving a stolen vehicle was a felony in Georgia.

On cross-examination, Officer Heaton testified that the defendant presently had a bench warrant for failure to appear on her traffic citation. Officer Heaton testified that the State of Georgia permitted the State of Tennessee to extradite individuals accused of felonies. He also testified that it was still possible for Georgia to charge the defendant with driving a stolen vehicle.

On redirect examination, Officer Heaton testified that he did not lock the defendant's holding cell door, and he did not know if anyone else had done so. He testified that Mr. Carter was placed in a different holding cell, while Ms. Carter was permitted to stay in the lobby. He estimated that the defendant stayed in the holding cell "probably three or four hours." In response to further questioning from the court, Officer Heaton testified that when he spoke with Detective Jones, he offered to arrest the defendant for running the stop sign so that he could hold her for him, but Detective Jones asked him to get the defendant's consent instead. He testified that he did not know if he would have arrested the defendant if she had not consented to wait for the investigators, and he indicated that he would have deferred to Detective Jones on the issue.

Officer Travis Jones of the Monroe County Sheriff's Department testified that he interviewed the defendant in conjunction with an investigation into a fire. He testified that the interview was recorded, and the defendant executed a *Miranda* waiver prior to the interview. He testified that he read the defendant her rights, and that the defendant appeared to understand them when she signed the form. Officer Jones testified that the defendant never indicated that she wished to exercise her rights during this interview. Officer Jones testified that he interviewed the defendant again sometime later. He testified that he again read the defendant her rights, and the defendant executed another *Miranda* waiver. Officer Jones testified that at some point during this second statement, the defendant indicated that she wanted a lawyer. He testified that in response to her request, he stopped the interview.

Officer Jones testified that, as he was leaving to go home after the second interview,

-4-

he was informed by the corrections staff that the defendant wanted to speak with him again. Officer Jones testified that he asked for the defendant to be brought back. Once she arrived, he read the defendant her *Miranda* rights again, and she executed another waiver. He testified that he doubled-checked with the defendant to make sure that she still did not want an attorney prior to starting the third and final interview. He testified that the defendant never indicated that she wished to exercise her rights during the final interview.

In response to questions from the court, Officer Jones testified that the second interview lasted approximately an hour and a half before the defendant indicated that she wished to have an attorney. He estimated that the defendant's third interview lasted around two hours. Officer Jones testified that the defendant never indicated that she was tired during any of her interviews and never asked for any clarification concerning her *Miranda* rights.

On cross-examination, Officer Jones testified that when the defendant was returned from Georgia, she was placed in a holding cell in the Monroe County jail. He testified that he allowed the defendant to rest for several hours before interviewing her later in the morning. He testified that, after the interview, he returned her to her holding cell. He interviewed her again on the following morning, and it was during this interview that the defendant requested an attorney. Officer Jones testified that the defendant was again returned to her holding cell. He testified that he requested a search warrant following this interview. He testified that the defendant was charged with first degree murder two days later. He testified that the defendant had not been charged with anything at the time of her first and second interviews.

Officer Conway Mason of the Monroe County Sheriff's Office testified that he was the officer tasked with retrieving the defendant from Georgia to assist with a fire investigation. He testified that he left between 10:00 p.m. and midnight in a black Expedition belonging to the Sheriff's Office. He testified that there was no cage in the vehicle or partition separating the front seats from the back seats. He testified that he arrived in Georgia, he made contact with the defendant, who told him that she was willing to return to Tennessee with him. He testified that the defendant was not handcuffed or shackled and that she slept most of the return trip. He testified that they stopped at one point and had breakfast. Officer Mason testified that the defendant was taken to the jail when they arrived back in Tennessee because it was not yet daylight. He testified that he never told the defendant she was under arrest and never restrained the defendant in any way. This concluded his contact with the defendant.

On cross-examination, Officer Mason testified that the defendant was sleeping in a holding cell when he arrived in Georgia. He testified that he did not put the defendant in a holding cell when they arrived in Tennessee but that he believed someone else had done so.

He testified that there were no warrants on the defendant when he picked her up, but he had been advised that the defendant was in a car belonging to the victim that had been reported stolen. When asked if he would have allowed the defendant to leave if she had attempted to do so in Georgia, the witness replied that he would have called Detectives Brannon and Jones for additional direction. When asked if the defendant could have left the holding cell in Monroe County jail if she had chosen to do so, Officer Mason testified that "[t]hat would have been up to [the defendant]" because she wasn't charged, but she would have needed to contact Detective Brannon or Detective Jones first. On further cross-examination, Officer Mason testified that it was not common practice to allow an individual to "just walk out of jail" if they were "put on a 48-hour hold."

On re-direct examination, Officer Mason testified that all individuals who indicate that they are willing to speak with the Monroe County Sheriff's Office are taken to the Monroe County jail. Officer Mason testified that the defendant agreed to come back and speak with the officers and did so voluntarily. He testified that at the time of the defendant's interviews, all interviews were conducted in the Monroe County jail in the Sheriff's office. He testified that the Sheriff's office was not a cell and had a conference table.

On re-cross examination, Officer Mason was asked why, if the defendant's presence was completely voluntary, did he "take her to the 48-hour hold and put her down [t]here in Monroe County Jail?" Officer Mason replied that he "didn't put the hold on her" and that the defendant had been awake for some time and needed a place to sleep. He testified that "we don't want her sleeping out in the front lobby, so that was just a place that was convenient for us and her . . . ." When asked about a particular locked door that appeared to confine the defendant, Officer Mason testified that at the time of the defendant's interviews, that door was not yet up, but there was a different door that was used that could be opened and closed at will. However, the witness testified that there was a second "locked," "big metal or steel" door separating the holding cells that required a key to access. Officer Mason testified that the jail's "holding cells" served multiple purposes, including "drunk tank cells" and "visitation booths."

After receiving this testimony, the court requested additional authority concerning whether it is permissible to detain someone for forty-eight hours for investigatory purposes and, if not, whether any statements so obtained could nonetheless be deemed voluntary in light of the fact that the defendant was locked in a jail cell for much of that period. The hearing was then concluded.

On August 8, 2012, the trial court granted the defendant's motion to suppress all three videotaped statements. In its written order, the trial court explained the State's theory of the case—that on April 7, 2011, the victim was murdered in his home, and after his death his

home was burned, his car was stolen, and attempts were made to dispose of his body. The trial court reviewed the testimony from the hearing, as well as an intake document from the Sheriff's Department indicating that the defendant was to be placed on an "48-hour hold per 716."[1]  The trial court observed that incriminating evidence against the defendant was gleaned from all three videotaped statements conducted during the "48-hour hold," and the defendant was eventually charged with multiple offenses pertaining to the homicide.

In suppressing the statements, the trial court relied on this court's decision in *State v. Bishop*, in which this court criticized the concept of a "48-hour hold" and explained that "the '48-hour hold' does not exist in our constitutional pantheon of acceptable practices" and "is patently unconstitutional and subjects any evidence acquired to suppression." *State of Tennessee v. Courtney Bishop*, No. W2010-01207-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 171, at *24 (Tenn. Crim. App. Mar. 14, 2012), *perm. app. granted*, *State v. Bishop*, 2012 Tenn. LEXIS 522 (Tenn. Aug. 15, 2012). After considering the law and reviewing the evidence, the trial court found as a factual matter that the defendant was arrested in Georgia without probable cause, and further found that even if probable cause had existed, "there should either have been extradition proceedings or a waiver of extradition signed for by the defendant before she could have been removed to the [S]tate of Tennessee."

The State filed a motion to rescind the trial court's order on the grounds that the *Bishop* case did not yet have legal authority because the State's Rule 11 application for permission to appeal in that case was still pending before the Tennessee Supreme Court[2] and because, it argued, the State had not yet had an opportunity to be heard and present proof concerning the voluntariness of the defendant's confession. The trial court held an additional pretrial hearing on August 10, 2012, at which time the State called Detective Douglas Brannon to the stand once again. Detective Brannon testified that he examined records from the Sheriff's Department concerning when the vehicle driven by Ms. Norwood had been reported stolen. Detective Brannon testified that the vehicle was entered into the National Crime Information Center on April 12, 2011, at 10:46 p.m. He testified that records reflected that Ms. Norwood's first interview was conducted on April 13, 2011, at roughly an hour and twenty minutes after 5:23 p.m. He testified that records reflected that Ms. Norwood's second interview occurred later that same night, on April 14, 2011, at 12:43 a.m. He testified that by the second interview, police executing a search warrant had discovered as-yet-unidentified human remains at the crime scene.

Detective Brannon testified that he obtained warrants on a regular basis, and that to

---

[1]  There is testimony in the record that "716 " was the call sign for Officer Conway Mason.

[2]  As noted above, said application was subsequently granted.

his knowledge, the clerk's office was not open after 5:00 p.m. on Monday through Friday. He testified that the defendant was charged on April 14, 2011.

On cross-examination, Detective Brannon testified that he was not aware of any written policy at the Monroe County Sheriff's Department concerning "48-hour holds." He testified that he had recently heard that he was not supposed to put people on "48-hour holds." Detective Brannon testified that "48-hour holds" had been used in investigations in the past. Detective Brannon also testified that someone in the clerk's office was usually available 24 hours, but sometimes, at the clerk's preference, officers would wait until the morning to conduct business. He testified that when a "hold" was used, it was normally "where we've reached the conclusion that there is a charge, or something has, had occurred to where it needs to be clarified the charge, what the proper charge would be, and who needs to be charged with one, if anybody." He testified that "holds" were "beyond investigation." However, under additional questioning, Officer Brannon conceded that a hold could be placed on an individual while they were "in the midst of the investigative stage." Officer Brannon testified that the notation on the defendant's intake form concerning the "48-hour hold" would have been placed there by the jailer. He testified that "in actuality some of" the reason the defendant was placed on 48-hour hold was to effectuate her arrest.

After receiving this evidence, the trial court denied the State's motion. On September 17, 2012, this Court granted the State's request for an interlocutory appeal of the trial court's order suppressing the defendant's videotaped statements pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Satisfied that the matter is properly before us, we proceed to consider the propriety of the trial court's order.

**ANALYSIS**

The State claims that the trial court erred by granting the defendant's motion to suppress. We review a trial court's decision concerning a motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). *See, e.g, State v. Brotherton*, 323 S.W.3d 866 (Tenn. 2010). A trial court's factual findings will be upheld so long as the evidence does not preponderate against them. *Odom*, 928 S.W.2d at 23. "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge." *Id.* "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.* "[O]ur review of a trial court's application of law to the facts is conducted under a de novo standard of review." *R. D. S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008).

At the outset, we note that during this process both parties have largely abandoned their original positions, and some arguments have been made for the first time on appeal—consequently, we are presented with many arguments and counter-arguments that the trial court neither heard nor considered prior to issuing its written order. The State now argues that the trial court erred by suppressing the defendant's videotaped statements not because the defendant was not yet under arrest and made the voluntary decision to travel back home, but rather because there was probable cause to arrest the defendant for driving a stolen vehicle at the time she was taken into custody in Georgia, and consequently her arrest was supported by probable cause. While acknowledging that the defendant was transported from Georgia to Tennessee without the benefit of formal extradition proceedings, the State argues that the defendant effectively consented to the transfer by voluntarily agreeing to return to Tennessee to speak with the officers, and there is no constitutional requirement that officers utilize formal extradition proceedings to effectuate a transfer. The appellee continues to maintain that the officers arrested the defendant in Georgia without probable cause, but now adds that, even if probable cause existed, the State violated the defendant's constitutional rights not because of anything having to do with extradition, but because it failed to provide her with a prompt judicial probable cause determination when she arrived in Tennessee.

After thorough review, we hold that the State is correct that the police officers had probable cause to arrest the defendant for driving a stolen vehicle in Georgia, and that consequently her initial arrest was lawful. We further conclude that the State provided the defendant with a judicial hearing concerning probable cause with sufficient haste to satisfy constitutional norms. Consequently, we reverse the order of the trial court suppressing the defendant's statements and remand the matter to the trial court for further proceedings.

## I. PROBABLE CAUSE TO ARREST THE DEFENDANT

The State argues that the trial court erred by determining that the defendant was arrested without probable cause. In considering this claim, we are mindful that both the federal and state constitutions protect citizens against unreasonable searches and seizures. *See* U.S. CONST. AMEND. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."); TENN. CONST, Art. 1, Sec. 7 ("[T]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures."). A warrantless seizure is presumed to be unreasonable—and any resulting evidence may be subject to suppression under the well-known exclusionary rule—unless the State demonstrates that the seizure at issue was conducted pursuant to one of the narrowly-defined exceptions to the warrant requirement. *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). A full-scale arrest supported by probable cause is an exception to the warrant requirement. *See e.g., Beck v.*

*Ohio*, 379 U.S. 89, 91 (1964) ("Whether th[e] arrest was constitutionally valid depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it . . . ."); *State v. Hanning*, 296 S.W.3d 44, 48 (Tenn. 2009) ("[F]ull-scale arrest . . . must be supported by probable cause."). "To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)); *see also State v. Richards*, 286 S.W.3d 873, 879 (Tenn. 2009) ("[A]rrest is supported by probable cause only if the facts, circumstances, and reliable information known to the officers will warrant a prudent person's belief that the suspect has committed an offense.").

We have little difficulty concluding that the facts known to Officer Heaton at the time he stopped the defendant in Georgia would have warranted a prudent person's belief that the suspect had committed an offense. Officer Heaton testified that: (1) he personally observed the defendant run a stop sign; (2) when he ran the license tags on the vehicle, those tags were not "in the system;" and (3) when he ran the vehicle's identification number through the NCIC, the vehicle came back as reported stolen. On these facts, a reasonable person would believe that the suspect had committed at least three offenses—the most serious of which was driving a stolen vehicle, a felony. For purposes of our analysis, it is immaterial that the officers in question did not believe that they were, in fact, arresting the defendant, nor does it matter that the officers did not attempt to justify their actions based on the presence of probable cause. An officer's subjective belief concerning whether an arrest is being effectuated is not dispositive of the constitutional inquiry, which is an objective one based on a reasonable person standard. *See e.g. State v. Williams*, 185 S.W.3d 311, 318 (Tenn. 2006) ("[T]he litmus test is the objective belief of a reasonable person in the position of the defendant, not that of the officer.").

The defendant argues that probable cause was lacking because there is no evidence concerning whether the individual who reported the vehicle stolen was a "citizen-informant," whose veracity is presumed for probable cause purposes, *see State v. Echols*, 382 S.W.3d 266, 279 (Tenn. 2012) ("[I]f an ordinary citizen provides information relied upon for probable cause, no showing of the informant's basis of knowledge or veracity is required."), or an informant from the "criminal milieu," whose basis of knowledge and credibility must be demonstrated, *see id.* The defendant points out that our Supreme Court has held that "[i]n the absence of any information as to whether an anonymous informant is a citizen-informant, the reliability of the informant may not be presumed." *Id.* However, in this case we are dealing with issue of the credibility of a crime victim, not an informant. The cases on which the defendant bases his argument deal with the constitutional analysis to be applied to anonymous tipsters, not crime victims. Neither the federal nor the state constitution requires

that crime victims be presumed untrustworthy for legal purposes until police officers can prove their trustworthiness by other means. Victims who report stolen property are not anonymous, and the potential for negative consequences to attend the filing of a false police report is well-known. The defendant's attempt to conflate the two vastly different situations would, if adopted, essentially require police officers to routinely run background checks on crime victims before using the information given to them by the victim to investigate the crime. The law does not require such a nonsensical result. The testimony reflects that the vehicle at issue in this case was reported stolen based on information provided by the title-owner of record. Upon discovering a different individual behind its wheel, officers were permitted to take the driver into custody.

## II.  PROMPT JUDICIAL DETERMINATION OF PROBABLE CAUSE

The defendant further argues that the trial court's decision should be upheld because her constitutional rights were violated when officers failed to provide her with prompt judicial review concerning the officer's probable cause determination. Individuals who are arrested absent a warrant have the right to prompt judicial review of the arresting officer's decision. *See, e.g,. Gerstein v. Pugh*, 420 U.S. 103, 125 (1975); *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996). "[J]udicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement. . . ." *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). When an arrested individual has not received a probable cause determination within forty-eight hours of his or her arrest, the burden shifts to the government to demonstrate extraordinary circumstances. *See id.*

Because the defendant raised this argument for the first time on appeal, the State has not responded to the argument. From the record, however, it is far from clear that the time between the defendant's arrest and the time that the defendant received her judicial determination of probable cause exceeded forty-eight hours.[3] Officer Heaton testified that he stopped the defendant's vehicle—which, as we have concluded, culminated in the defendant's arrest—at approximately 1:00 a.m. on April 12, 2011. However, there is other testimony and evidence in the record that the vehicle at issue was not reported stolen until 10:46 p.m. on April 12, 2011. Obviously, both of these facts cannot be correct. If the defendant was in fact arrested around 1:00 a.m. on April 13, 2011 (the following day), the remaining time schedule attested to by Detective Brannon (arriving back in Tennessee at 5:23 p.m. on April 13, 2011, having an initial interview an hour and twenty minutes later, and having a second interview at 12:45 a.m. on April 14, 3011) makes sense. Moreover, no witness testified that the defendant was held for an entire day in Georgia prior to being

---

[3] As this argument was not presented to the trial court, the trial court made no factual finding on the subject.

picked up. Officer Heaton himself acknowledged when he testified that he had been awake for thirty hours, and the transcript reflects that he failed to respond to some questions during his testimony. Considering the record as a whole, we conclude that the defendant was detained beginning in the early morning hours of April 13, 2011.

The affidavit of complaint and probable cause determination is dated April 14, 2011, but no time is recorded on that document. However, regardless of when it was signed on that date, it would be less than forty-eight hours following the defendant's arrest. Consequently, the defendant's judicial review is presumptively prompt, and there is nothing appearing in the record to rebut that presumption. The defendant claims that the officers acted in bad faith by intentionally delaying their decision to seek a warrant to assist in the investigation, but there is no testimony in the record supporting that assertion.

Even if our determination concerning the date of the defendant's arrest were to be proven erroneous, the forty-eight hour rule would not be exceeded by much, and there were certainly unusual circumstances present in this case. First, the defendant had to be transported from Georgia to Tennessee—a trip of some hours, according to record testimony—before the judiciary in Tennessee could take any action to protect the defendant's constitutional rights. Second, the defendant's police detention was, as far as any of the actors involved knew, entirely voluntary. While courts engaging in retroactive scrutiny of the entire situation may easily conclude that an individual locked in multiple jails cells over an extended period was, in fact, under arrest, the fact remains that both the police and the defendant appeared to have operated under the erroneous assumption that the defendant's participation in these activities was entirely voluntary. Such a fundamental mutual mistake surely qualifies as an extraordinary circumstance, and the defendant's far-from-reluctant participation in the entire course of conduct surely mitigates any constitutional concerns that might arise from any potential *de minimis* violation on the "48-hour test" imposed by *McLaughlin* that might have occurred.

Although we hold that the defendant's constitutional rights were not violated on these unusual facts (and consequently that suppression of none of her statements is warranted), we would add that even had a constitutional violation of the prompt-judicial-determination-of-probable-cause-requirement occurred, any suppression of defendant's first two statements would still be unwarranted. It is plain from the record that the defendant's first two statements to police occurred within forty-eight hours of her initial detention even if that detention had begun on April 12. Any violation of the prompt-judicial-determination-of-probable-cause-requirement that could be found on these facts would not occur until forty-eight hours after her *de jure* arrest, when the burden would shift to the State to explain the delay. Her statements cannot be "fruit of the poisonous tree" if no tree had yet been planted.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed and this case remanded to proceed consistent with this opinion .

_____
JOHN EVERETT WILLIAMS, JUDGE