# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. ANTHONY DRAINE A.K.A. ANTHONY DRAINE-LOVE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 12-04580     Chris Craft, Judge**

**No. W2013-02436-CCA-R3-CD  - Filed April 29, 2015**

A Shelby County Criminal Court Jury convicted the appellant, Anthony Draine a.k.a. Anthony Draine-Love, of aggravated burglary.  He was sentenced as a Range II, multiple offender to nine years in the Tennessee Department of Correction.  On appeal, the appellant challenges the trial court's denial of his motion to suppress and contends that the evidence was insufficient to sustain his conviction.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

Norma McGee Ogle, J., delivered the opinion of the court, in which Camille R. McMullen and Timothy L. Easter, JJ., joined.

Stephen Bush and Phyllis Aluko (on appeal); William Yonkowski and Samuel Christian (at trial), Memphis, Tennessee, for the appellant, Anthony Draine a.k.a. Anthony Draine-Love.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General, and Mariane Bell and Chris Lareau, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant's charge stemmed from a break-in that occurred at a residence in Memphis.  At trial, the victim, Valencia Yvette Woodin testified that on Saturday, April 7, 2012, she was driving home when a neighbor called to inform her that someone had broken into her apartment.  The victim arrived home between 2:00 and 3:00 p.m.  When she entered

the residence, she saw that a living room window had been broken. She walked outside to examine the window and noticed that the screen had been removed. She saw the screen in a nearby ditch.

The victim walked through her apartment and noticed that several items were missing: three children's Easter baskets, candy, food, a television, a DVD player, a "suitcase rolling [school] bag," Social Security cards, and other forms of identification. The victim estimated that the total value of the items taken was around $500 or $600. The victim said that she did not give anyone permission to enter her apartment and remove items that day. The victim called the police, who came to the apartment, searched, and dusted for fingerprints.

The victim denied that she had ever invited the appellant to her apartment. She said that she had a conversation with the appellant at a store in the neighborhood and that she had invited him to the church where she was a minister. The appellant gave her his telephone number, but she was not aware that he knew where she lived. The victim's neighbor told her that the appellant had been at her neighbor's apartment "earlier."

On cross-examination, the victim said that she and her children had left the apartment that morning at 10:30 a.m. and that they returned between 2:00 and 3:00 p.m. She had not given anyone else access to her apartment. The victim said that the intruder had attempted to take a picture, but it was too big to fit through the window. The victim said that the intruder would have had to walk through her entire apartment to obtain all of the items.

When the victim examined her apartment, the window was the only damage to an "entry point[]" that she noticed. The victim explained that just outside the window was a "walk path" that was for use by the tenants. The window had been broken so that someone could reach in and unlock it. The victim said that someone could enter the apartment easily through the window.

The victim said that she watched the police dust the window for fingerprints; however, she did not notice the officers looking for fingerprints anywhere else. The victim acknowledged that she had met the appellant at a Cricket store where he worked and that he had tried to pursue a relationship with her "as far as trying to invite himself." However, the victim did not encourage him, stating that she "never kn[e]w him long enough to even be in a relationship." The victim said that the appellant gave her his telephone number and that he called her on his brother's telephone.

Memphis Police Officer Mujahed Abdellatif testified that on April 7, 2012, he went to the victim's apartment to dust for fingerprints. He dusted inside and outside the apartment and found a "possible print" on the window the intruder used to access the apartment.

On cross-examination, Officer Abdellatif said that the bottom half of the window was broken and that he found the fingerprint outside on the bottom of the window. He was unable to find any other viable prints. Officer Abdellatif said that the area surrounding the window was not an area to which the public had access. He explained, "[I]t's a bunch of trees back there. So I think if you didn't live there you didn't have no reason being back there." He acknowledged that he did not know how long the fingerprint had been on the window.

Officer Larry Preston, a latent print examiner with the Memphis Police Department, was qualified to testify as an expert in latent fingerprint analysis. Officer Preston testified that he entered the fingerprint lifted from the scene into a database and determined that the fingerprint matched the appellant. When asked how many points of comparison were necessary to make a positive identification, Officer Preston responded, "There's really no set number that you really need. It depends, the quality of the print, the type of print it is. But generally you would want, you know, a minimum of seven or eight good points." In the instant case, he identified more than fifteen matching points of comparison.

On cross-examination, Officer Preston said that any given fingerprint could have at least fifty points of comparison but that a match could be made by comparing as few as seven or eight points. In the instant case, Officer Preston found more than fifteen matching points of comparison between the fingerprint found at the scene and the appellant's fingerprint. Nevertheless, he examined the entire fingerprint. He stated, "When I feel like the print is identical I stop usually but I may look at the whole print. But there's no point in looking at a . . . a hundred or fifty points. . . . [I]t's just a waste of time." Officer Preston asserted that in his office, at least two examiners checked and identified the fingerprints before agreeing upon a match.

Officer Preston said that when he ran the fingerprint found at the scene through the AFIS database,[1] he asked AFIS to provide him with the top ten potential matches. He explained that the database "doesn't identify the print. It only brings back suspect of possibilities. Examiners actually make the identifications." He said that the first print returned by the database was usually the match. Officer Preston said that no one in his office had ever made a false identification. However, he did not know whether there was "an error rate in this process." He said, "I can only speak for what happens in my office, I don't know about anybody else."

On redirect examination, Officer Preston said that he had been a latent print examiner since 1974 and that he had extensive training in performing the examinations. He said that

---

[1]AFIS stands for "Automated Fingerprint Identification System."

part of his training occurred at the Federal Bureau of Investigation (FBI) office in Quantico.

On recross-examination, Officer Preston acknowledged that in another case "the FBI at one point made a one hundred percent positive identification of a fingerprint that was later found to be erroneous."

Memphis Police Detective Joshua Brown testified that after police learned the appellant's fingerprint had been found at the scene of the burglary, the appellant was brought into the precinct. After being advised of his Miranda rights, the appellant agreed to speak with Detective Brown. The appellant initially denied any involvement in the burglary. However, after being informed that his fingerprint was found at the scene, the appellant said that he entered the apartment through a window. He walked through the house and took food from a freezer, Easter baskets, a converter, and a cable box.

The appellant acknowledged that he took a black backpack with wheels from the owner's bedroom and that he put the food and other items in the backpack. He said that he sold the DVD player, the converter box, and the Easter baskets and that he "got rid of" the backpack.

On cross-examination, Detective Brown said that the appellant did not request an attorney nor did he "ask to remain silent."

The appellant chose not to testify or offer proof. The jury found the appellant guilty of aggravated burglary. The trial court sentenced the appellant as a Range II, multiple offender to nine years in the Tennessee Department of Correction.

On appeal, the appellant challenges the trial court's denial of his motion to suppress his statement to police and the sufficiency of the evidence sustaining his conviction.

## II. Analysis

A. Motion to Suppress

On appeal, the appellant contends that the trial court should have suppressed his confession to the police because he was not timely advised of his Miranda rights and that his confession was not knowingly and voluntarily given because of his "mental difficulties." The State asserts that the trial court correctly found that the confession was admissible. We agree with the State.

Immediately prior to trial, the trial court held a hearing on the appellant's motion to

suppress. At the hearing, Detective Joshua Brown testified that on April 30, 2012, he and Officer Smith interviewed the appellant at the task force office. Detective Brown asserted that the appellant was advised of his Miranda rights prior to any discussion of "the particulars" of the case. Detective Brown said that he read the advice of rights form to the appellant, asked the appellant to read the form, and asked the appellant if he understood his rights. After the appellant said that he understood his rights, Detective Brown asked him to sign the form acknowledging that he had been advised of his rights, and the appellant complied. The form reflected that the discussion began at 3:40 p.m.

Detective Brown said that the appellant's demeanor was relaxed and normal and that he did not appear to be intoxicated or suffering from any mental difficulties, noting that his responses to questions were rational. Detective Brown said that he did not doubt the appellant's ability to knowingly waive his Miranda rights. Detective Brown denied coercing the appellant or using forceful tactics to overcome his will.

On cross-examination, Detective Brown acknowledged that the appellant did not read the advice of rights form out loud; however, Detective Brown asserted that he "read [the appellant] his rights on the paper, asked him to read over them and sign them." Detective Brown said that he was not present when the appellant was arrested and did not know the exact time of the arrest.

Detective Brown said that the appellant was interviewed in a conference room and that one of his hands was handcuffed to the chair. At the time of the interview, Detective Brown did not know anything about the appellant's mental health history. Detective Brown acknowledged that the appellant may have appeared "eccentric. . . . But I mean nothing out of the absolute normal." The appellant was coherent and cooperative. Detective Brown did not threaten the appellant or make promises to him. During the interview, Detective Brown offered the appellant water, asked if he needed to use the restroom, and ensured that he was comfortable.

Detective Brown said that the appellant initially denied any involvement in the burglary. However, after Detective Brown informed him that his fingerprints were found on the window used to enter the victim's apartment, the appellant agreed to talk. Officer Smith typed the statement as the appellant was speaking. After the statement was typed, Detective Brown had the appellant read the statement and instructed him that if the statement were true, to initialize the first two pages and sign his name on the third. Detective Brown did not have the appellant read his statement out loud. Detective Brown was not aware that the appellant quit school after the eighth grade and could not read or write well.

The appellant testified that when Detective Brown informed him that his fingerprints

-5-

had been found at the victim's residence and that the police knew he had broken into the victim's house, the appellant responded, "I don't know what you're talking about." Detective Brown told the appellant that if he confessed to the burglary, he could go home. At that point, the appellant said, "[W]ell I did it." Detective Brown told the appellant to sign some papers, and the appellant complied. The appellant maintained that he did not know what was written on the papers; nevertheless, he signed where Detective Brown indicated, thinking he would be released.

The appellant said that he attended school until the ninth grade. He could not read well and thought he had told Detective Brown of his impairment. The appellant said that when Detective Brown handed him the statement, "I just looked at it. And he told me to put yes on everything. That's what I did." The appellant also denied that the officers offered him water during the interview.

Following the appellant's testimony, defense counsel argued

> that there's some serious question about whether [the appellant] freely gave his statement or his statement was accurate or not. [The appellant] doesn't read and write well. And the fact that he's signed off on a statement that wasn't read to him and that he's not capable of reading indicates that there's some problems with it. And he indicates that he only gave the statement because he was promised that he could go home then.

The trial court said that the statement did not contain any complicated language and that it appeared to be voluntary. The court found that the appellant lacked credibility and that Detective Brown was credible. The court said, "I see the signed waivers. The fact that they would just make this up and tell him to just sign and put yes on everything, it's just hard for this Court to believe." The court concluded that the statement was knowingly and voluntarily made after the appellant was advised of his Miranda rights and, accordingly, denied the appellant's motion to suppress. On appeal, the appellant challenges this ruling.

Our supreme court recently reiterated that

> "[T]he standard of review applicable to suppression issues is well established. When the trial court makes findings of fact at the conclusion of a suppression hearing, they are binding upon this Court unless the evidence in the record preponderates against them. Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in

-6-

the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.

Our review of a trial court's application of law to the facts is de novo with no presumption of correctness. Further, when evaluating the correctness of the ruling by the trial court on a motion to suppress, appellate courts may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial."

State v. Bishop, 431 S.W.3d 22, 34-35 (Tenn. 2014) (emphasis omitted) (quoting State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012)).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to individuals accused of criminal activity, thus necessitating our examination of the voluntariness of a statement taken during custodial interrogation. State v. Northern, 262 S.W.3d 741, 763 (Tenn. 2008). Specifically, for a confession to be admissible, it must be "'free and voluntary; that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). In other words, "the essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." State v. Climer, 400 S.W.3d 537, 568 (Tenn. 2013).

If, prior to making a statement, the accused is advised of his Miranda rights and then knowingly and voluntarily waives those rights, the statement is admissible against the accused. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998) (citing Miranda, 384 U.S. at 444-45). Our supreme court has held that "the State need only prove waiver [of Miranda rights] by a preponderance of the evidence. In determining whether the State has satisfied that burden of proof, courts must look to the totality of the circumstances." State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997) (citation omitted). In the course of our examination, we consider the following factors in determining the voluntariness of a confession: the appellant's age; education or intelligence level; previous experience with the police; the repeated and prolonged nature of the interrogation; the length of detention prior to the confession; the lack of any advice as to constitutional rights; the unnecessary delay in bringing the appellant before the magistrate prior to the confession; the appellant's

intoxication or ill health at the time the confession was given; deprivation of food, sleep, or medical attention; any physical abuse; and threats of abuse. State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). Proof that an accused was made aware of his Miranda rights, although not conclusive, weighs in favor of the admission of a confession into evidence. See State v. Carter, 16 S.W.3d 762, 767 (Tenn. 2000).

On appeal, the appellant complains that the officers questioned him before he was advised of his Miranda rights. He maintains that at trial, Detective Brown testified that questioning began at 2:00 p.m. but that the appellant was not advised of his rights until 3:40 p.m. The State argues that this issue was not raised in the trial court and is waived.

At the suppression hearing, the appellant limited his complaints to whether his limited ability to read and write, his mental difficulties,[2] and the officer's promises of leniency impacted the voluntariness of his confession. In his motion for new trial, the appellant merely asserted that the trial court erred by denying his motion to suppress. Therefore, we conclude that the appellant waived the issue. Nevertheless, we note that at the suppression hearing Detective Brown testified that the appellant was informed of his Miranda rights prior to any discussion about "the particulars" of the case. Moreover, although Detective Brown initially testified at trial that the appellant was brought into the precinct and advised of his rights at approximately 2:00 p.m., after reviewing the advice of rights form, he clarified that the interview began at 3:40 p.m.

Next, the appellant argues that his lack of education, poor comprehension skills, and mental problems affected whether his confession was knowingly and voluntarily made. He also asserts that the voluntariness of his confession was affected by his being held for two hours then being told that he could go home if he confessed. This court has previously stated that a defendant's "illiteracy, mental disability, and educational background . . . do not, in and of themselves, render [a] statement involuntary. Rather, they constitute factors for the trial court to consider in evaluating the totality of the circumstances." State v. John Philip Noland, No. E2000-00323-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 608, at *6 (Knoxville, Aug. 3, 2000) (citations omitted). Detective Brown testified that the appellant was relaxed, rational, coherent, and cooperative and that he appeared to understand his Miranda rights and his statement. Additionally, Detective Brown asserted that he read the advice of rights form to the appellant, that he had the appellant read the form, and that the appellant signed the form prior to any discussion of "the particulars" of the case. Detective

---

[2]We note that the appellant adduced no proof about his mental health at the suppression hearing or during the guilt phase of his trial; however, his mental health records were submitted as an exhibit at the sentencing hearing to show that the appellant had "been continually diagnosed as having schizoid effective disorder, a history of cocaine abuse and borderline to mild mental retardation."

Brown further denied that he made any promises to the appellant in order to elicit a confession. The trial court specifically accredited the testimony of Detective Brown and found that the appellant was not credible. We conclude that the evidence does not preponderate against the trial court's finding that the confession was knowing and voluntary and that the trial court did not err by denying the appellant's motion to suppress. See State v. Danny Ray Smith, No. E2012-02587-CCA-R3-CD, 2014 Tenn. Crim. App. LEXIS 784, at *22-25 (Knoxville, Aug. 13, 2014).

## B. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Aggravated burglary is defined as "burglary of a habitation." Tenn. Code Ann. § 39-14-403. "A person commits burglary who, without the effective consent of the property owner . . . [e]nters a building . . . with intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-402(a).

The proof at trial reflected that the appellant confessed to the crime. Nevertheless, in Tennessee, "[a] conviction based on a confession cannot stand unless the jury was presented with independent corroborating evidence." State v. Clark, 452 S.W.3d 268, 279

(Tenn. 2014). Our supreme court has explained that to determine whether the confession has been sufficiently corroborated, appellate courts are to apply the following "'modified trustworthiness' corroboration test":

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

Bishop, 431 S.W.3d at 58-59 (footnote omitted). Our supreme court further explained that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime." Id. at 60.

On appeal, the appellant contends that without his confession, the proof is not sufficient to convict him. However, we have concluded that the trial court did not err by admitting the confession. Moreover, the appellant's confession was corroborated by the proof at trial. The victim testified that she left her apartment and returned to discover that a window had been broken and that the exact items listed by the appellant in his statement had been taken from the apartment. When police investigated, they discovered the appellant's fingerprint on the exterior bottom half of the broken window. The fingerprint and the victim's testimony about the items taken corroborated the appellant's confession.

The appellant also questions the accuracy of the fingerprint analysis. However, the jury heard the testimony about the fingerprint analysis and accredited Officer Preston's conclusion that the fingerprint matched the appellant's. This court has previously stated that "'[f]ingerprint evidence alone may support a conviction and the weight to be given to such evidence is for the jury's determination.'" State v. Richmond, 7 S.W.3d 90, 92 (Tenn. Crim. App. 1999) (quoting State v. Evans, 669 S.W.2d 708, 710 (Tenn. Crim. App. 1984)). Based upon the foregoing, we conclude that a reasonable jury could have found the evidence sufficient to convict the appellant of aggravated burglary.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____

NORMA MCGEE OGLE, JUDGE