IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 6, 2017

## STATE OF TENNESSEE v. MICHAEL KEVIN SCHIPP

**Appeal from the Criminal Court for Putnam County**
**No. 2015-CR-421   Gary McKenzie, Judge**

———————————————————

**No. M2016-01933-CCA-R3-CD**

———————————————————

Defendant, Michael Kevin Schipp, was convicted of one count of burglary of an automobile and one count of aggravated assault with a deadly weapon and received a total effective sentence of fifteen years.  On appeal, Defendant argues that the trial court erred in failing to instruct the jury on self-defense with regard to his aggravated assault conviction.  After a thorough review of the record and relevant authorities, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Craig P. Fickling, District Public Defender, and L. Scott Grissom, Assistant Public Defender, for the appellant, Michael Kevin Schipp.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Victor Gernt, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

*Facts*

In May of 2015, Marshall Thurman and Chase Eldridge lived in a fraternity house near the campus of Tennessee Tech University in Cookeville, Tennessee.  In the early morning hours of May 19, 2015, they, along with their friend Cameron Carroll, were in the front room of the house drinking and watching a movie when they heard a scream.  The three men went outside and walked around to investigate the source of the scream.  Having not seen or heard anything else, the men walked back toward the fraternity house.

Mr. Thurman then heard glass breaking and took off running toward the back of the house. On the street directly behind the house, Mr. Thurman saw a man reaching inside the front passenger window of Mr. Eldridge's vehicle. Mr. Thurman knew it was not Mr. Eldridge reaching into the car because Mr. Eldridge was still behind him. Mr. Thurman described the man as bald, around five feet ten inches tall, and wearing a red and white striped rugby-style shirt.

Mr. Thurman, infuriated, ran up and tackled the man to prevent him from stealing anything from the car. Mr. Thurman, who was six feet three inches tall and weighed 245 pounds, did not say anything to the man as he tackled him at a full sprint. Mr. Thurman fell to the ground away from the car; he did not land on top of the man. The man got up and did not try to run away but turned and engaged Mr. Thurman in a fight. The man began throwing punches at Mr. Thurman, which he dodged or blocked. Mr. Thurman denied throwing any punches. The man then pulled out a folding knife and opened it. The man stating that he had a knife was the only communication between the two during the confrontation. The man then stabbed Mr. Thurman on the left side underneath his arm, puncturing Mr. Thurman's lung. Mr. Thurman admitted that he punched the man at the same moment that the man stabbed him. Mr. Thurman initially remained on his feet but then fell to the ground. The man then punched Mr. Thurman in the head before running off. Mr. Thurman walked to the hospital where he spoke to police. Mr. Thurman was eventually transported to Vanderbilt Medical Center in Nashville and spent two days in the hospital.

Mr. Eldridge testified that as he and Mr. Thurman walked back toward the fraternity house after unsuccessfully searching for the source of the scream, Mr. Thurman suddenly took off running. Mr. Eldridge did not think anything of it and continued walking in the same direction as Mr. Thurman had gone. When Mr. Eldridge reached the driveway of the fraternity house and looked into the backyard, he saw Mr. Thurman in the middle of the street engaged in a fight with a bald, white man of average height wearing a red and white striped rugby-style shirt. The two men were "squared up to each other like in a fighting posture, and they both just kind of swung at each other, and they both hit each other." Mr. Eldridge ran toward the pair as they were swinging at each other. Mr. Eldridge testified that it appeared that Mr. Thurman got hit in the ribcage and the other man got hit in the face. Mr. Thurman then fell, and the other man ran off down the street. Mr. Eldridge walked with Mr. Thurman to the hospital. Mr. Thurman stated that he had been stabbed and was clutching the side of his chest.

After speaking with the police at the hospital, Mr. Eldridge was told to return to the parking lot behind the fraternity house because his car had been broken into, which Mr. Eldridge did not know at that time. Mr. Eldridge testified that the front passenger side window was "smashed" and that there was broken glass both inside the car and in the parking lot. Mr. Eldridge's car, which was locked, contained several plastic totes

filled with his belongings as well as an overnight bag. The bag, which had been in the backseat prior to this incident, was in the front passenger seat of the car on top of the broken glass that was in the seat. Mr. Eldridge did not give anyone permission to break the window or enter the vehicle.

Officer David Harris of the Cookeville Police Department responded to the hospital and obtained a description of the suspect, which he relayed to other officers. Defendant was developed as a suspect. Officer Harris, Officer Mike Herrick, and Detective Tammy Goolsby arrived at an address associated with Defendant that was just down the street from the scene of the incident. Detective Goolsby transported Defendant to the Cookeville Police Department where he gave a statement claiming to have been asleep prior to the police arriving at the residence. During a search of the residence, a striped rugby-style shirt was discovered in a laundry basket. The shirt was damp while the other clothes in the basket were dry; Officer Harris noted that there was a misting rain that day. The shirt also had several spots that appeared to be blood. Testing by the Tennessee Bureau of Investigation confirmed that at least one spot was consistent with Mr. Thurman's DNA and another was consistent with Defendant's DNA.

*Analysis*

On appeal, Defendant argues that the trial court erred in failing to give a jury instruction regarding the law on self-defense. Defendant concedes that he was engaged in unlawful activity by breaking into Mr. Eldridge's car. However, Defendant contends that his unlawful activity "is not a bar to self-defense completely, but is a bar to the 'true man' doctrine" such that Defendant "would have had a duty to retreat before he used force." According to Defendant, the refusal to give a jury instruction on self-defense under the facts of this case "is the equivalent of holding that someone who is ever in the wrong has to not resist and take whatever punishment his captors believe fit the perceived crime." The State responds that the proof presented at trial did not fairly raise the defense of self-defense and that the trial court properly denied Defendant's request to give the instruction.

A trial court has a duty to provide a "complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). This duty includes "giving jury instructions concerning fundamental issues to the defense and essential to a fair trial." *State v. Anderson*, 958 S.W.2d 9, 17 (Tenn. Crim. App. 1998). "A trial court's refusal to grant a special instruction is error only when the general charge does not fully and fairly state the applicable law." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). Erroneous jury instructions "are generally subject to a 'harmless error' analysis" unless they "mislead the jury as to the applicable law or fail to 'fairly submit' the relevant legal issues, such as available defenses." *Id.* at 128 (citing *State v. Williams*, 977 S.W.2d 101,

- 3 -

104-05 (Tenn. 1998); *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

A defendant is entitled to an instruction on self-defense if it is fairly raised by the evidence. *Myers v. State*, 206 S.W.2d 30, 32 (Tenn. 1947). "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. If the defense is fairly raised by the admissible evidence, "the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply," *id.*, and the issue of whether a defendant acted in self-defense becomes a factual determination to be made by the jury, *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). However, "[t]he issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c).

As relevant to this case, Tennessee Code Annotated section 39-11-611(b)(2) provides that:

> [A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Additionally, the threat or use of force against another is not justified "if the person using force provoked the other individual's use or attempted use of unlawful force, unless: (A) [t]he person using force abandons the encounter or clearly communicates to the other the intent to do so; and (B) [t]he other person nevertheless continues or attempts to use unlawful force against the person." T.C.A. § 39-11-611(e)(2).

The Tennessee Supreme Court has recently clarified that "the phrase 'not engaged in unlawful activity' is a condition on a person's statutory privilege not to retreat" rather

than a complete bar to self-defense. *State v. Antoine Perrier*, __ S.W.3d __, No. W2015-01642-SC-R11-CD, 2017 WL 5588864, at *8 (Tenn. Nov. 21, 2017). "[A] duty to retreat does not mean that a person cannot defend herself or himself." *Id*. at *10. Consistent with the common law duty to retreat, a defendant engaged in unlawful activity "'must have employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force. *Id*. (quoting *State v. McCray*, 512 S.W.2d 263, 265 (Tenn. 1974)). Furthermore, when the defendant's unlawful activity is what provokes the other individual's use of force, the defendant must "abandon[] the encounter or clearly communicate[] to the other the intent to do so." T.C.A. § 39-11-611(e)(2)(A); *see also Antoine Perrier*, 2017 WL 5588864, at *6 (noting that the portion of the "no-duty-to-retreat rule" that required the defendant be "without fault in provoking the confrontation" is presently codified in T.C.A. § 39-11-611(e)(2)).

In this case, the trial court found that there was "not a single shred of evidence . . . to satisfy abandonment of the unlawful activity." Defendant has conceded that he was engaged in unlawful activity by breaking into Mr. Eldridge's car. Mr. Thurman's use of force against Defendant was clearly provoked by this unlawful activity as Mr. Thurman testified that he tackled the auto-burglar in an attempt to prevent him from stealing anything. Thus, for a self-defense instruction to be warranted in this case, there must be some proof that Defendant abandoned the encounter or clearly communicated his intent to do so and that Mr. Thurman nevertheless continued to engage in using force against him. *See Sims*, 45 S.W.3d at 9 ("There is no dispute that Sims provoked the use of lethal force in this case by burglarizing Smith's home. The question is whether Sims abandoned the encounter and Smith continued or attempted to use unlawful force against Sims."); *State v. Bobby W. Jenkins and Tareaun D. Griffin*, No. M2005-00593-CCA-R3-CD, 2006 WL 618303, at *6 (Tenn. Crim. App. Mar. 13, 2006) (holding that "under these factual circumstances, Defendant Griffin is only entitled to claim that self-defense is 'fairly raised by the evidence' if there is evidence that he 'abandon[ed] the encounter or clearly communicate[d] to the other the intent to do so'"), *perm. app. denied* (Tenn. Aug. 28, 2006).

Even in the light most favorable to Defendant, there is no evidence that he abandoned the encounter, communicated his intent to do so, or otherwise attempted to retreat prior to stabbing Mr. Thurman. Mr. Thurman testified that after he tackled Defendant, both men got up and faced each other ready to fight. While Mr. Eldridge did not see the initial tackle, he did see both men in a "fighting posture." Neither witness testified that Defendant attempted to run away before he began punching Mr. Thurman. Additionally, neither witness testified that Mr. Thurman punched Defendant before Defendant punched Mr. Thurman. While Mr. Thurman was unarmed, Defendant pulled out a folding knife and opened it. Defendant never said anything to Mr. Thurman except to state that he had a knife. Mr. Eldridge saw each man punch each other simultaneously: Defendant punched (or stabbed) Mr. Thurman in the ribcage and Mr. Thurman punched

Defendant in the head.  Only after Mr. Thurman fell to the ground did Defendant flee the scene.  On appeal, Defendant concedes that he had a duty to retreat prior to using force but contends that he had no opportunity to do so.  However, Defendant points to no evidence in the record from which reasonable minds could accept that he "'employed all means in his power, consistent with his own safety, to avoid danger and avert the necessity of'" using force against Mr. Thurman.  *See Antoine Perrier*, 2017 WL 5588864, at *10 (quoting *McCray*, 512 S.W.2d at 265).  Because self-defense was not fairly raised by the evidence presented in this case, the trial court did not err in failing to give a jury instruction on self-defense.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.


_____
THOMAS T. WOODALL, PRESIDING JUDGE