IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2017 Session

## STATE OF TENNESSEE v. MACARTHUR REMBERT, AKA MCARTHUR BROWN

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-684      Mark J. Fishburn, Judge**

_____

### No. M2017-00065-CCA-R3-CD

_____

The Defendant, MacArthur Rembert, also known as McArthur Brown, was convicted by a Davidson County Criminal Court jury of aggravated burglary, a Class C felony, and theft of property valued between $1000 and $10,000, a Class D felony, and was sentenced to an effective term of fifteen years in the Tennessee Department of Correction. On appeal, the Defendant argues that: (1) the trial court erred in denying his motion to suppress because the officer lacked probable cause to place him under arrest and search his vehicle; (2) the trial court erred in denying his motion under State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), because the State's loss of surveillance video footage resulted in a fundamentally unfair trial; and (3) the evidence is insufficient to sustain his conviction for theft of property because the State did not present sufficient evidence to establish the value of the stolen goods. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Courtney A. Teasley, Nashville, Tennessee, for the appellant, MacArthur Rembert, aka McArthur Brown.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

# FACTS

The Defendant was indicted on seven charges arising from a series of crimes in an area of North Nashville that occurred in October 2012: one count of burglary of a motor vehicle, three counts of theft, and three counts of aggravated burglary. This appeal involves one count of aggravated burglary and one count of theft, stemming from an incident at the apartment of Malcolm Woodard on October 23, 2012.

Prior to trial, the Defendant filed both a motion to suppress and a motion to dismiss. In his motion to suppress, the Defendant sought to exclude evidence obtained from his vehicle on grounds that the search was improper. In his motion to dismiss, the Defendant argued that all charges should be dismissed because of a failure to preserve evidence, i.e., a Ferguson violation. The trial court denied both motions.

## Facts Related to Motion to Suppress

Frederick Massey testified at the preliminary hearing that on October 14, 2012, he discovered that someone had broken into his Mustang GT and stolen his "after-market" speakers. Mr. Massey called the police and waited in the parking lot for them to arrive. As he was waiting, Mr. Massey saw the Defendant pull up in a burgundy or red four-door sedan, possibly a Pontiac Bonneville. He then saw the Defendant bring Mr. Massey's tire jack and speakers out from behind some nearby bushes. Mr. Massey confronted the Defendant, and the Defendant got into his vehicle and fled. Mr. Massey noted the license plate number on the Defendant's car as he drove away.

Melba Scates testified at the preliminary hearing that her apartment was broken into on October 15, 2012. Among a number of other things, a jewelry box was stolen and was the only property that had been recovered.

Lakina Natallia testified at the preliminary hearing that on October 19, 2012, she had just gotten home from work when she heard something being inserted in the front door of her apartment. Through the peephole, she saw someone outside the door but could not see the person's face. She opened the door and saw two men leaving in opposite directions, walking very fast. She saw that one of the men was wearing white athletic shoes. She closed the door to her apartment and heard the noise of a car as if the men were driving away. Soon after, Ms. Natallia went to the management office and watched the surveillance video of the exterior areas of the apartment complex. She observed two men on the video, which was the only activity on the footage that occurred during the time period at issue. She said that when she saw the men on the video, they

were "kind of leisurely walking" and "calm." Ms. Natallia identified the Defendant as one of the individuals at her door.

Officer Paul Flournoy with the Metro Nashville Police Department testified that he was involved in the investigation of several burglaries at the Granstaff and Villages of the Green apartment complexes in October 2012. To curtail the crime, the police department created a special team to target the area. On the day the Defendant was ultimately arrested, someone tried to break into a woman's apartment in the Villages, but the would-be burglar ran away when the woman exited screaming. The suspect was seen on a surveillance video getting into a car and quickly leaving the scene. Officer Flournoy went to the Villages' office and viewed the video, on which he saw the Defendant and another man get into a vehicle and drive off at a high rate of speed. Other officers had already viewed the video and obtained a license tag number from the vehicle. Officer Flournoy recalled that the video showed the suspects running or at least "walking awful fast" to get into the car, although one could not tell that the suspects were running from looking at the still photographs taken from the video.

Officer Flournoy decided to continue his investigation by going to speak with the victim of one of the earlier burglaries. When he arrived at the Granstaff Apartments to speak with that man, Officer Flournoy saw the Defendant and a woman standing near a vehicle that appeared to be the same one he had seen in the video. Officer Flournoy noticed that the Defendant was covering up what appeared to be televisions in the backseat of the vehicle. The vehicle was missing a hubcap, as the "be on the lookout" based on the surveillance video had mentioned, and the license plate matched the vehicle from the video. The Defendant and his female companion went inside an apartment, and Officer Flournoy parked across the street from the vehicle.

Officer Flournoy testified that, a few minutes later, he saw the Defendant walk outside holding a trash can. He and the Defendant had a brief innocuous conversation, and then the Defendant dumped the contents of the trash can into the dumpster and went back inside the apartment. Officer Flournoy noted that the police later learned a stolen jewelry box and jewelry were among the contents thrown into the dumpster. A few minutes later, the Defendant and his female companion exited the apartment, got into the car, and started to drive away. Before they exited the apartment complex, Officer Flournoy activated his blue lights and pulled over the car. Officer Flournoy advised the Defendant that he had seen him and the vehicle on the surveillance video. Officer Flournoy observed "two TVs on the back seat that had been covered up and there was a big flathead screwdriver sitting on the driver's side behind [the] front seat that had a lot of white paint on it[.]" It appears that Officer Flournoy placed the Defendant under arrest for "suspicion of attempted home invasion" at this point.

During this timeframe, a call came in reporting another burglary. The call came from Malcolm Woodard, who reported that when he got home from work that day, he noticed that his front door had been "forced open" and that, among other things, three televisions were missing from his home. The televisions were recovered from the Defendant's vehicle at the time of his arrest.

## Facts Related to Motion to Dismiss

Officer Dean Haney, who was an officer with the Metro Nashville Police Department at the time of the incidents in this case, testified that he was among the officers investigating a string of burglaries in North Nashville. He was called to review surveillance video from the Villages of the Green apartment complex that displayed possible persons of interest in the burglaries. Officer Haney received the footage on a CD, which he took to the police station. The video showed the parking lot from two different camera angles but no footage of indoor areas. On the video, Officer Haney observed the "persons of interest on it and also a vehicle on there." He printed six photographs from the video footage and "put them into a BOLO and then sent it out to the police department."

Officer Haney recalled that he later gave the disc to the lead investigator, Detective Willie Middleton, who had since retired. After that, the video was apparently misplaced. Officer Haney made extensive efforts to locate the video but was unsuccessful. However, Officer Haney said that the video did not contain any relevant evidence other than what was reflected in the photographs he had printed.

On cross-examination, Officer Haney admitted that the individuals in the video were persons of interest and that more investigation would have been necessary before obtaining an arrest warrant. He said that the video itself was fairly short, running "five, ten minutes at the most." Officer Haney agreed that the photographs taken from the video showed the persons of interest walking.

## Facts from Trial

Malcolm Woodard testified that he left for work around 7:30 a.m. on October 23, 2012. When he returned home that afternoon, he found that his front door was ajar and the wreath on the door had been knocked off. He called the police immediately and waited until they arrived to go inside. Mr. Woodard discovered that he was missing three televisions, two 50-inch screen and one 42-inch screen; a DVD/VCR combo player; a DVD player; a laptop computer; and a camera. Mr. Woodard recalled that the two 50-inch televisions were about two years old and that he had purchased them for $749 each. The 42-inch television was about three years old, and he had purchased it for $499. He

paid $69 for the DVD/VCR player. He estimated the value of the laptop to be "[r]oughly 900 to a thousand dollars" and the value of the camera to be "[m]aybe $300." He was not asked about the value of the DVD player. Later that evening, Mr. Woodard met police officers at a neighboring apartment complex and recovered his televisions, the DVD/VCR combo player, and the DVD player. Mr. Woodard noted that the door to his house was white and appeared to have been pried open.

Officer Flournoy testified to his involvement in the case consistently with his testimony at the suppression hearing.

Waylon Profitt with the Metro Nashville Police Department testified that he reported to the Granstaff Apartments in response to a call of a traffic stop with "some stolen property inside the vehicle." The vehicle, a maroon Pontiac Bonneville, had "two TVs in the backseat that were covered up by a blanket, and . . . two screwdrivers in the back floorboard." Officer Profitt said that the screwdrivers would have been considered evidence because they could have been used to pry something open rather than for their intended purpose. Officer Profitt stated that a third television and a DVD player were recovered from the Defendant's female companion's apartment.

Detective Lindsay Smith with the Metro Nashville Police Department testified that she went to Mr. Woodard's residence in response to a burglary call. Because of the damage to the doorframe, officers determined that the point-of-entry was the front door and attempted to lift fingerprints from it. She also lifted prints from a DVD case that was found in a location where Mr. Woodard had not left it.

Jacqueline Cockrill with the Metro Nashville Police Department testified that she worked as a forensic scientist for the latent fingerprint department. Ms. Cockrill examined the fingerprints lifted by Detective Smith. She determined that the prints lifted from areas of the door were of no value. The print lifted from the DVD case did not match that of the Defendant or his co-defendant.

Retired Detective Willie Middleton of the Metro Nashville Police Department testified that he responded to the Granstaff Apartments where Officer Flournoy had the Defendant in custody. Officer Flournoy had also retrieved stolen property from the vehicle the Defendant was in, as well as from a nearby dumpster. Detective Middleton served as the lead detective in the case.

## ANALYSIS

On appeal, the Defendant argues that: (1) the trial court erred in denying his motion to suppress because the officer lacked probable cause to place him under arrest

and search his vehicle; (2) the trial court erred in denying his motion under Ferguson, 2 S.W.3d 912, because the State's loss of surveillance video footage resulted in a fundamentally unfair trial; and (3) the evidence is insufficient to sustain his conviction for theft of property because the State did not present sufficient evidence to establish the value of the stolen goods.

## I. Motion to Suppress

The Defendant first argues the trial court erred in denying his motion to suppress because Officer Flournoy lacked probable cause to place him under arrest and search his vehicle, in which the stolen televisions were found.

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed de novo. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" Keith, 978 S.W.2d at 865 (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

One of the exceptions to the warrantless arrest of an individual is when an officer has probable cause for believing that the person has committed a felony. See Tenn. Code Ann. § 40-7-103(a)(3); State v. Echols, 382 S.W.3d 266, 277 (Tenn. 2012) (citing State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009)). "Probable cause . . . exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent [person]

in believing that the [defendant] had committed or was committing an offense.'" <u>Echols</u>, 382 S.W.3d at 277-78 (quoting <u>State v. Bridges</u>, 963 S.W.2d 487, 491 (Tenn. 1997)).

In its factual recitation, the trial court stated:

On October 15, 2012, Frederick Massey discovered his vehicle had been burglarized while parked in front of his residence at Grandstaff [sic] Apartments. A tire jack and speakers were taken. Massey reported the burglary and waited for police. He then observed Defendant and another male pull up in a maroon vehicle and park behind his vehicle. He witnessed Defendant retrieve a tire jack and speakers from some nearby bushes. He then confronted Defendant at gunpoint. Defendant sat the property down, ran back to the maroon vehicle, and fled the scene. Massey took down the license tag of the vehicle.

On October 15, 2012, Melba Scates realized that property had been taken from her apartment at the Villas at Metro Place. She was missing several items, including a jewelry box. She did not see who went into her house.

On October 19, 2012, Lakina Nat[a]llia arrived home to her apartment at the Villas at Metro Place when she heard a noise at her front door. As she started for the door, it was forced open and Defendant was standing in [the] doorway. Defendant fled when he saw [the] victim. Surveillance footage was taken which showed Defendant getting into a maroon vehicle.

On October 23, 2012, Malco[l]m Woodard reported that two flat screen televisions were taken from his residence. That same day, Officer Flournoy viewed the surveillance footage of Defendant getting into a maroon vehicle after fleeing from Ms. Nat[a]llia's apartment. He then went to Grandstaff [sic] Apartments to talk to prior burglary victims, who had provided him with the license plate number of the maroon vehicle previously.

At Grandstaff [sic], he observed Defendant and his girlfriend carrying items that appeared to be TVs to the backseat of the maroon vehicle he recognized from the video. Officer Flournoy checked the tag number of the vehicle; he verified that it matched the tag number that had been previously provided to him.

He witnessed Defendant dispose of a trash bag. While Officer Flournoy was waiting for back up, Defendant got in his car and attempted to leave. Officer Flournoy pulled Defendant over and placed him under arrest. He then recovered the trash bag; inside the bag were items that were consistent with items that had been reported as stolen, including Ms. Scates' jewelry box. The TVs recovered from Defendant's back seat were verified to be the TVs stolen from Mr. Woodard earlier that day.

The Defendant concedes that Officer Flournoy had reason to investigate his vehicle, briefly detain him, and search the car. He only asserts that there was no "probable cause to arrest [him] on sight." He claims that the facts recited by the trial court in its findings on the issue were erroneous and that the correct facts would not have supported a finding of probable cause.

We conclude that Officer Flournoy had probable cause to stop and arrest the Defendant. Officer Flournoy was aware of the October 15 burglary of Mr. Massey's vehicle in which Mr. Massey witnessed the Defendant retrieve his stolen property from nearby bushes and observed the Defendant's vehicle and noted its license plate. Officer Flournoy viewed surveillance video of the Defendant leaving the scene of the October 19 attempted break-in of Ms. Natallia's apartment in a maroon vehicle. Prior to pulling the Defendant over, Officer Flournoy confirmed that the vehicle the Defendant was driving was the same as the one observed by Mr. Massey. Officer Flournoy also confirmed that the Defendant was the individual he had seen on the surveillance video from Ms. Natallia's apartment complex. Officer Flournoy observed the Defendant covering up what appeared to be televisions in the backseat of the vehicle. These facts, accompanied with Officer Flournoy's knowledge of the recent burglaries in the neighborhood, provided more than mere suspicion that the Defendant had committed an offense. The record supports the trial court's determination that Officer Flournoy had probable cause to arrest the Defendant and that the televisions were "lawfully recovered in a search incident to arrest." The Defendant's quibbles with the trial court's recitation of the facts essentially ask this court to resolve any ambiguities in Officer Flournoy's testimony in the Defendant's favor rather than the prevailing party's favor, which is not what the standard of review envisions.

## II. Motion to Dismiss

The Defendant next argues that the trial court erred in denying his motion under Ferguson, 2 S.W.3d 912, because the State's loss of surveillance video footage resulted in a fundamentally unfair trial.

When the State has lost potentially exculpatory evidence, Tennessee courts first analyze whether the State had a duty to preserve the evidence. Ferguson, 2 S.W.3d at 917. If the proof demonstrates that the State has breached a duty to preserve evidence, a court must evaluate (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. Id. The central objective is to protect the defendant's right to a fundamentally fair trial. Id. If, after evaluating all the factors, the trial court determines that a trial without the missing evidence would be fundamentally unfair, the trial court may dismiss the charges, deliver a curative instruction to the jury, or craft such other orders as appropriate to protect the defendant's right to a fair trial. Id.

As to this issue, the trial court found that although the State was negligent in its failure to preserve the videotape, the loss was not malicious or intentional. The court also found that the significance of the video was "slight" because the still photographs "reasonably fill[ed] the void left in the absence of the video surveillance" and were less damaging to the Defendant than the video. The court further found that there was other evidence at trial that supported the Defendant's conviction, namely "eyewitness accounts, including testimony of investigating officers, and the recovery of stolen items in the possession of or recently in the possession of the [D]efendant." The court concluded that the evidentiary value of the video was "much more favorable to the State than it is to the [D]efendant."

The record supports the findings of the trial court. It appears that the investigators were at least moderately negligent, though certainly not malicious, in losing the videotape. However, the most important factor here is whether there was reliable substitute evidence available, which we answer in the affirmative. The still photographs taken from the video show both the Defendant and the vehicle, which is essentially all the video would have shown as well. There was never any allegation that the video captured criminal activity. The relevance of the video to the Defendant is also somewhat in question. The video and the substitute photographs reflected the aftermath of the attempted break-in of Ms. Natallia's apartment on October 19, 2012. Although the footage contributed information leading to the Defendant's arrest, it was not relevant to the actual issues in this case. The surveillance photographs were not introduced as evidence nor were they discussed during the State's proof. Instead, the State's proof focused solely on the burglary of Mr. Woodard's home on October 23, 2012. Moreover, if anything, the video would have been more damaging to the Defendant than the substitute photographs. The photographs show the Defendant standing near the vehicle; whereas, at least one viewer of the video, Officer Flournoy, recalled that the video showed the Defendant *running* away. We conclude that the Defendant's trial was fundamentally fair even without the surveillance videotape.

## III. Sufficiency

The Defendant lastly argues that the evidence is insufficient to sustain his conviction for theft of property because the State did not present sufficient evidence to establish the value of the stolen goods. The Defendant does not dispute that a theft occurred.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a). Theft of property valued at $1000 or more but less than $10,000 is a Class D felony. Id. § 39-14-105(a)(3). Tennessee Code Annotated section 39-11-106 defines "value" as "(i) [t]he fair market value of the property or service at the time and place of the offense; or (ii) [i]f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense[.]" Id. § 39-11-106(a)(36)(A). If the value of the property cannot be ascertained by the aforementioned criteria, the property is deemed to have a value of less than fifty dollars. Id. § 39-11-106(a)(36)(C). The fair market value of property is a question of fact for the jury. See State v. Hamm, 611 S.W.2d 826, 828-29 (Tenn. 1981). "The market value of the article stolen, and not its original cost, is the true criterion when it is necessary to establish the value of the property in order to fix the grade of the offense[.]" Id. at 829.

The Defendant contends that the evidence of value is insufficient because Mr. Woodard only testified to the amount he paid for the items and did not estimate their current value. Mr. Woodard testified that the two 50-inch televisions were about two years old and that he had purchased them for $749 each; the 42-inch television was about three years old, and he had purchased it for $499; and he paid $69 for the DVD/VCR player. Nonetheless, the jury could infer from this testimony that the total value of the items after accounting for depreciation was more than $1000. Most importantly, however, Mr. Woodard explicitly testified that the *value* of the laptop was between $900 and $1000 and that the *value* of the camera was approximately $300. "A witness may testify to the value of the witness's own property or services." Tenn. R. Evid. 701(b). The value of these two items alone reflect a value greater than $1000.

The record shows that the jury was properly instructed on how to assess the value of the stolen property – that the value of the stolen property was the fair market value at the time of the offense. The evidence is sufficient for the jury to conclude that the value of the stolen property was greater than $1000.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE